UNITED STATES of America

v.

Joshua EILBERG.

Civ. A. No. 79–1623.

United States District Court,
E. D. Pennsylvania.

Oct. 22, 1980.

See also, D.C., 89 F.R.D. 473.

Peter F. Vaira, U. S. Atty. by Gary Tilles and Antoinette R. Stone, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

John Rogers Carroll and Thomas Colas Carroll, Philadelphia, Pa., for defendant.

Steven Ross and Stanley Brand, Washington, D. C., for Clerk, U. S. House of Representatives.

Thomas B. Rutter, Philadelphia, Pa., for intervenors Corson & Getson.

## OPINION

LOUIS H. POLLAK, District Judge.

In February of 1979, Joshua Eilberg, a lawyer who had been a Congressman from northeast Philadelphia for six terms (January of 1967 to January of 1979), pleaded guilty to one count of a federal criminal indictment. That count charged a violation of 18 U.S.C. § 203. Under Section 203, a Member of Congress is guilty of a crime if

he, "otherwise than as provided by law for the proper discharge of official duties . . . receives . . . any compensation for any services rendered . . . by himself or another at a time when he is a Member of Congress . . . in relation to any proceeding [or] application . . . in which the United States is a party or has a direct and substantial interest, before any department [or] agency. . . ." The criminal conduct admitted by Mr. Eilberg was that he had received a share of the fee paid by Hahnemann Hospital to the (then) law firm of Eilberg, Corson, Getson & Abramson[1] for services performed while Mr. Eilberg was a Congressman, by Mr. Eilberg and other members of the firm, in connection with Hahnemann's application to a federal agency, the Community Services Administration, for a major construction grant.

After the criminal proceedings were concluded, the United States brought this civil action for sums allegedly owed the United States by the former Congressman. The complaint sets out three "claims for relief." But these three claims comprehend only two causes of action.

The first cause of action—conceptualized in alternative forms in the first and second claims for relief—is perceived by the United States as arising directly from the unlawful course of conduct acknowledged by Mr. Eilberg in his guilty plea. It asserts that the United States is entitled to recover the share received by Mr. Eilberg of his firm's Hahnemann fee, this constituting the "compensation" received by Mr. Eilberg in violation of Section 203. The first claim for relief predicates the asserted entitlement on a theory of breach of fiduciary duty and a consequent constructive trust of which the United States is the beneficiary. The second claim for relief predicates the same asserted entitlement on a theory of breach by Mr. Eilberg of his implied agency contract with the United States and resultant unjust enrichment recoverable by the United States.

The second cause of action—set forth in the third claim for relief—rests upon another (chronologically, and perhaps factually, overlapping) course of conduct which, it is alleged, was pursued by Mr. Eilberg while he was in Congress and which, it is further alleged, defrauded the United States of an as—yet undetermined sum of money. Specifically, it is asserted that, each month, from May of 1973 to January of 1978, Mr. Eilberg certified that telephone toll calls charged by Mr. Eilberg, or family members, or associates, to Mr. Eilberg's Congressional telephone credit card were official calls when, in fact, they dealt with matters unrelated to Mr. Eilberg's responsibilities as a Congressman. The United States contends, in effect, that, by virtue of these allegedly false certifications, Mr. Eilberg avoided reimbursing the United States for long—distance calls which he, not the United States, should have borne the cost of. The United States views each of these alleged false certifications as a violation of the False Claims Act; and for each culpable certification the United States seeks, pursuant to the Act, double the damages sustained and a $2,000 penalty. 31 U.S.C. § 231.

Mr. Eilberg's motion to dismiss challenges the substantive viability of both causes of action. And the Clerk of the House of Representatives—resisting a proposed subpoena for House records (logs of, and other materials relating to, Mr. Eilberg's toll calls) with which the United States hopes to document its claim under the False Claims Act—denies the justiciability of the second cause of action.

I.

What is at stake in the first cause of action is a sum—alleged by the United States to approximate $35,000—constituting Mr. Eilberg's aggregate distributive share, received by him in acknowledged contravention of 18 U.S.C. § 203, of the fee paid by Hahnemann Hospital to Mr. Eilberg's law firm for legal services rendered in con-

1. Or to its *alter ego*, Corson, Getson & Abramson. The subsequent dissolution of the firm(s)

is the subject of state court litigation.

nection with Hahnemann's application for a grant from the Community Services Administration.[2] The United States is not the only suitor for Mr. Eilberg's share of the Hahnemann fee. In litigation now going forward in the Court of Common Pleas, arising out of the break-up of Mr. Eilberg's firm, two of Mr. Eilberg's former partners–Lawrence Corson and Allan Getson–are seeking to recover, *inter alia*, the same share of the same fee. To protect their state law claim against Mr. Eilberg from what they deem an unwarranted, or in any event, subordinate, federal claim which may nevertheless be pressed by the United States as preemptive of, or at least competitive with, their state law claim, Messrs. Corson and Getson moved to intervene in this federal proceeding. For reasons explained in a previous opinion, *United States v. Joshua Eilberg*, 89 F.R.D. 473 (E.D.Pa. 1980), I granted that motion.

■ It is common ground that the United States' first cause of action has no statutory basis. The cause of action, if it exists, is one rooted in federal common law–rocky soil which produces only a small harvest. *Cf. United States v. Standard Oil Company*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); and see *Hart and Wechsler, The Federal Courts and the Federal System* 830–32 (2d ed. 1973); Friendly, *In Praise of Erie–And of the New Federal Common Law*, 39 N.Y.U.L.Rev. 383, 411–12 (1964). The question is whether the cause of action here pressed by the United States–whether characterized as one sounding in breach of fiduciary duty or as one sounding in unjust enrichment–is an authentic part of the federal common law.

The bedrock of the asserted cause of action is a decision announced by the Supreme Court seventy years ago. In *United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910), Mr. Justice Lurton, on behalf of an unanimous Court, sustained a civil action brought by the United States against a former captain in the Army Engineers who was alleged to have taken a large bribe for the letting of a profitable harbor improvement contract. The cause of action thus upheld was one which sought to compel the defendant Oberlin M. Carter " . . . to account for illicit gains, gratuities, and profits received by him . . ." Mr. Justice Lurton explained the nature of the cause of action in the following words (*id.* at 305–6, 30 S.Ct. at 519–520):

If it be once assumed that the defendant Carter did secretly receive from Greene and Gaynor a proportion of the profits gained by them in the execution of the contracts in question, the right of the United States in equity to a decree against him for the share so received is made out. It is immaterial if that appears whether the complainant was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any actual loss by fraud or otherwise. It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, "You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct." Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation

---

**2.** As is more fully explained in footnote 3, *infra*, Mr. Eilberg denies that his entire distributive share of the Hahnemann fee reflected representational "services" by himself and/or his law partner(s) for which Section 203 forbade him to receive "compensation." That is to say, Mr. Eilberg contends that his guilty plea covers far fewer compensated "services" than the totality of compensated "services"–some for which a congressman may not lawfully be compensated but some for which he may lawfully be compensated–covered by his share of his firm's fee.

of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

This venerable judge–fashioned public remedy for a federal official's fraud has retained its vitality. In *United States v. Kearns*, 595 F.2d 729 (1978), the Court of Appeals for the District of Columbia found that the United States had stated a viable claim in a complaint alleging (1) that the two defendants, while senior officials of the Export–Import Bank, had sold, at a price nearly three times the market, shares they each held in a Thai pulp and paper company with which the defendants had previously been associated (and to which the Bank had loaned several million dollars before the defendants assumed their posts at the Bank), and (2) that the company purchasing the defendants' shares was a subsidiary of a Japanese conglomerate which did a lot of business with the Bank. Speaking through Judge Bazelon, the court said: "The purpose of the . . . remedy is not to restore particular funds to the Government, but to provide a means of enforcing the loyalty of its agents. The action pursued here is a proper tool, based on common–law notions of principal–agent relations, for controlling the possible loss of impartial public administration." *Id.* at 734.

Mr. Eilberg contends that *United States v. Carter* is without application in an instance such as the one at bar, in which the proposed target of the federal common law civil suit has been charged and found guilty under 18 U.S.C. § 203. Mr. Eilberg points out that Congress has fashioned a particular statutory remedy for the benefit of the United States as a companion to criminal proceedings successfully maintained under the chapter of the criminal code–Chapter 11, "Bribery, Graft, and Conflicts of Interest"–which includes 18 U.S.C. § 203. The argument is that the adoption of a statutory remedy was preemptive, foreclosing the pursuit by the United States of any pre–existing common law remedies for Mr. Eilberg's acknowledged crime. The statutory remedy, set forth in 18 U.S.C. § 218, is a delegation to the President, or to agency heads designated by him, of authority to "rescind any contract . . . [or] . . . grant . . . awarded . . . by or for any agency of the United States . . . in relation to which there has been a final conviction for any violation of this chapter. . . ."

The contention that Section 218 is a *pro tanto* narrowing of *United States v. Carter* was considered in *United States v. Podell*, 572 F.2d 31 (2d Cir. 1978), a civil action brought by the United States to recover legal fees and campaign contributions which former Congressman Bertram L. Podell had received and conspired to receive, in contravention of 18 U.S.C. § 203, for services performed in relation to proceedings pending before the FAA–as admitted by Mr. Podell in an antecedent plea of guilty. Noting that Section 218 describes the rescission of a contract or grant as a remedy "[i]n addition to any other remedies provided by law," Chief Judge Kaufman, speaking for the Second Circuit, rejected the contention.

Reliance on Section 218 to oust the common law cause of action is not only syntactically vulnerable, it imputes to Congress a policy judgment which has no discernible supporting rationale. Section 218 comes into play after a conviction under Section 203 or some cognate provision of Chapter 11 of Title 18. Under Mr. Eilberg's reading of Section 218, a criminal conviction would not make rescission of a tainted grant an available remedy *additional* to recoupment from the public malefactor of his illicit fee. It would insulate the malefactor from recoupment, in exchange for a remedy of rescission very frequently not directed at the malefactor and whose invocation might in many instances be deemed by the President or his surrogate not to be in the interests of the United States.

■ And so, agreeing with the ruling in *United States v. Podell*, I deny the motion

272

to dismiss the first and second claims for relief.[3]

## II.

In its third claim for relief–embodying its asserted second cause of action–the United States sues under the False Claims Act, 31 U.S.C. § 231. The gravamen of the claim is the allegation that Mr. Eilberg, while a Congressman, in fifty–six consecutive monthly certifications to the Clerk of the House and the House Committee on Administration, misrepresented as official an undetermined number of telephone toll calls which were paid for out of the House contingent fund, and for which, but for the alleged misrepresentations, Mr. Eilberg would have had to reimburse the United States.

Section 231 provides, in pertinent part, as follows:

Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United

States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

## A.

◼ The first question posed by Mr. Eilberg's motion to dismiss the United States' third claim for relief is whether a false certification constitutes a false "claim" within the meaning of the False Claims Act when the effect of such certification is not to trigger the payment of money by the United States but to insulate the certifier from having to reimburse the United States for money expended by the United States.

Although the False Claims Act has been considered by the Supreme court on several occasions,[4] there appears to have been no occasion for the Court to address the precise issue posed here. Of the few relevant lower court cases, the most recent seems to be one in this district–Judge Davis' decision nine years ago in *United States v. Marple Community Record, Inc.*, 335 F. Supp. 95 (E.D.Pa.1971). There the question was whether Section 231 had been breached by false representations to postal authorities that a periodical's subscription roster was large enough to entitle the periodical to a second–class mailing permit. Judge Davis held that the Government's attempt to mount a claim under the False Claims Act was unavailing: " ... [H]istory and semantics indicate that fraud associated with an

---

**3.** As adumbrated in Footnote 2, *supra*, Mr. Eilberg also contends that the first and second claims for relief are defective in that they purport to sweep within their ambit the entirety of Mr. Eilberg's share of the Hahnemann fee. Mr. Eilberg's position seems to be that, while the guilty plea may to taken as an acknowledgment that some fraction of his share of the Hahnemann fee reflected representational "services" rendered by him and/or one or more of his law partners on Hahnemann's behalf for which he was forbidden by Section 203 to receive "compensation," much of his share of the Hahnemann fee reflected "services" which, while "rendered in connection with" the Hahnemann grant application, were, nonetheless, not performed "before any department [or] agency," within the meaning of Section 203–e. g. "serv-

ices" to secure state funding supplementary to the requested federal grant. Assuming, *arguendo*, that there is merit in Mr. Eilberg's reading of Section 203, this would not mean that the first and second claims for relief are subject to dismissal. It would appear to mean that the amount ultimately recoverable by the United States would be reduced *pro tanto*.

**4.** See, e. g., *United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926); *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *Rainwater v. United States*, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); *United States v. Neifert–White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

obligation owed by an individual to the government does not fall within the purview of the Act." *Id.* at 100. In reaching this conclusion, Judge Davis expressly rejected the reasoning of Judge Rifkind, who had reached precisely the contrary result twenty–five years before in *United States ex rel. Rodriguez v. Weekly Publications,* 68 F.Supp. 767 (S.D.N.Y.1946).

The crux of Judge Rifkind's ruling was as follows (*id.* at 770):

> Even if we were to say that the claim must be for money, such was the claim made by defendants when it demanded, as of right, a substantial postal subsidy. Let us suppose that it was permissible for defendants to mail their magazines at regular postage rates, and then, subsequently, to submit to the post office a demand or claim for a remission of part of the postage paid on the ground that the publication was entitled to second–class rates. This would not be unlike a claim for a refund of taxes. Certainly if the demand or claim by the publisher were false, such misconduct would come within the statute. I see no real difference in the present situation, but merely a difference in bookkeeping form.

I find that Judge Rifkind's analysis is persuasive; that the analysis is harmonious with the Supreme Court's subsequent observation that its own cases construing the False Claims Act have "consistently refused to accept a rigid, restrictive reading . . . ," *United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968); and that it is applicable here.

## B.

■ The second ground on which Mr. Eilberg predicates his motion to dismiss the third claim for relief is that pursuit of the claim is expressly foreclosed by 2 U.S.C. § 95:

> No payment shall be made from the contingent fund of the House of Representatives unless sanctioned by the Committee on House Administration of the House of Representatives. Payments made upon vouchers approved by said

Committee shall be deemed, held, and taken, and are declared to be conclusive upon all the departments and officers of the Government: *Provided,* That no payment shall be made from said contingent fund as additional salary or compensation to any officer or employee of the House of Representatives.

The same contention–that the statutory recital that "[p]ayments . . . approved by said Committee . . . are . . . conclusive upon all the departments and officers of the Government" precluded the United States from bringing suit under the False Claims Act–was pressed in *United States ex rel. Hollander v. Clay,* 420 F.Supp. 853 (D.D.C. 1976), a suit under the False Claims Act against Congressman William L. Clay of Missouri. The suit sought double recovery, together with the statutory $2,000 per false claim, for disbursements to Congressman Clay from the House contingent fund, such disbursements constituting reimbursement to the Congressman for allegedly false travel vouchers reporting trips greatly inflated in cost or never taken at all. After reviewing the mid–nineteenth century genesis of Section 95, which reflected mounting Congressional hostility to Treasury attempts to audit the expenditures of members of the Senate and House who sought Treasury reimbursement, Judge Flannery found that "the term conclusive meant only that the Treasury must honor the request of a coordinate branch of government for disbursement of funds." *Id.* at 858. And given (as the Supreme Court determined a quarter of a century ago in *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 [1955]) that Congressmen enjoy no general exemption from judicial pursuit for pressing false claims on the federal fisc, Judge Flannery concluded–correctly in my view–that Section 95 should not be read to bar effective implementation of the Act.

Confirmation of Judge Flannery's holding may be found in another aspect of the False Claims Act. A civil suit under the Act is one of the limited class of causes of action inuring to the United States that can be vindicated by a private litigant who under-

takes to initiate a *qui tam* proceeding, saving to the United States a right, but not an obligation, to enter the case and thereafter carry it forward as sole plaintiff. 31 U.S.C. § 232; and see, e. g., *United States ex rel. Rodriguez v. Weekly Publication, supra; United States ex rel. Hollander v. Clay, supra.* To give the language of Section 95 some preclusive effect when the United States is a plaintiff in False Claims Act litigation might yield the anomalous result that a law suit commenced by a private plaintiff could not be successfully taken over by the United States.[5]

### C.

Under Resolution 10 of the House of Representatives, documents in the custody of the House are subject to subpoena only after "a proper court has determined upon the materiality and relevancy" of the material intended to be the target of compulsory court process. See *In re Grand Jury Investigation*, 587 F.2d 589, 591–92 n.1 (3d Cir. 1978). Shortly after initiating this suit, the United States filed a "Motion for a Determination of Materiality and Relevancy" of certain documents in the files of the Clerk of the House, Hon. Edmond L. Hershaw, Jr., the production of which the United States deems necessary. The documents sought to be subpoenaed are described as follows:

> [a]ny and all billings and other records maintained by the Clerk . . . relating to telephone toll calls from or charged to the Office of former Representative Joshua Eilberg . . . for the period from and including May of 1973 through and including January of 1978; and all controlling House Regulations pertinent to such billings and records.

The Clerk resists the motion on the following ground (*Memorandum in Opposition to Motion of the United States Attorney for A Determination of Materiality and Relevancy*, pp. 5–6):

**5.** It may also be noted that in the present case, in contrast with *United States ex rel. Hollander v. Clay*, it does not appear that the propriety of any "[p]ayments" from the House's contingent fund will be in issue. What will be in issue is whether Mr. Eilberg undertook, through false

The United States Attorney contends, and requests judicial concurrence in the contention, that certain records of the House are relevant and needful for use in the civil action presently pending. The materiality and relevancy of the documents sought to be discovered must be contingent upon the propriety of the underlying cause of action. If this Court lacks, or is compelled by judicial doctrine to refuse, jurisdiction over the subject matter or if the question is non–justiciable under traditional judicial standards then it cannot and should not issue a finding of materiality and relevancy. It is the contention of the Clerk of the United States House of Representatives that the precepts of the judicially–formulated "political question doctrine" inescapably lead to the conclusion that the underlying cause of action is "not justiciable in federal court because of the separation of powers provided by the Constitution." *Powell v. McCormack*, 395 U.S. 486, 517 [89 S.Ct. 1944, 1962, 23 L.Ed.2d 491] (1969).

\*     \*     \*     \*     \*     \*

It is submitted by the Clerk that the jurisdiction of an Article III court cannot be invoked for purposes of sifting through each and every phone call made by a congressman and his staff in order to ascertain which if any were improperly determined to be "official" by the House of Representatives without interfering in the due function of a coordinate branch and violating of [sic] the separation of powers doctrine. The interposition of the judiciary in such a manner into the internal affairs of the legislative branch is foreclosed by the application of the political question doctrine which renders the dispute nonjusticiable.

In summary form, the syllogism advanced by the Clerk comes to this:

certifications as to the character of numerous telephone toll calls, fraudulently to reduce his obligation to reimburse the contingency fund for payments to the telephone company which were quite properly made.

1. Article I, Section 5, clause 2 of the Constitution confers on "[e]ach House" the authority to "determine the Rules of its Proceedings..."

2. Among the subjects which the House of Representatives has addressed, pursuant to its constitutionally allocated rule–making power, are (1) which toll telephone calls Members of the House should reimburse the United States for, and (2) who should determine whether particular telephone calls fall within the to–be–reimbursed category. In particular, pursuant to Section 57 of Title 2–a 1971 statute which confers on the Committee on House Administration the authority to "fix and adjust from time to time . . . the amounts of allowances (including the terms, conditions, and other provisions pertaining to those allowances) within the following categories: . . . allowances for telephone and telegraph and other communications . . . ," (2 U.S.C. § 57) [6]–the House of Representatives, through rules published by the Committee on House Administration, has directed each Member to review telephone toll billings for "improper charges, or charges for unofficial calls for messages noted on the originals of the bills." *Regulations and Accounting Procedures for Allowances and Expenses of Committees, Members and Employees of the United States House of Representatives,* Committee on House Administration, 96th Cong., 1st Sess. 128 (1979).[7]

3. Thus, the norm of "unofficialness," as the talisman of what telephone toll calls a Congressman should reimburse the United States for, is one embodied in a House rule–namely, the requirement that toll billings be screened for "unofficial" calls. Moreover, via the same rule, the house has imposed on each Member the responsibility of reviewing that Member's own toll bills, thereby in effect establishing each Member as a duly constituted tribunal authorized to interpret "unofficial" and apply it to the toll calls for which that Member is accountable.

4. In the Clerk's view, this means that, as seen from the perspective of an Article III court, the entire process of determining whether the United States should be reimbursed for a Member's telephone toll calls should be perceived as non–justiciable, shielded from judicial scrutiny by "a textually demonstrable constitutional commitment of the issue to a coordinate political department. . . ." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *Powell v. McCormack,* 395 U.S. 486, 518–519, 89 S.Ct. 1944, 1962–1963, 23 L.Ed.2d 491 (1969).[8]

i.

The United States does not quarrel with the Clerk's insistence that a court, in enforcing the False Claims Act or any other

---

**6.** In 1976, the authority conferred on the Committee on House Administration by Section 57 was curtailed by the enactment of Section 57a (2 U.S.C. § 57a), which specified that the categories of allowances embraced by Section 57 could "be fixed or adjusted only through the adoption of a resolution by the House of Representatives," except that the Committee could continue to have authority to make marginal adjustments necessitated by price changes, technological advances, etc. Section 57a's modification of Section 57 does not appear to affect the separation–of–powers issues posed by the Clerk's syllogism and the counter–syllogism of the United States.

**7.** In *In re Grand Jury Investigation Etc.,* 587 F.2d 589, 595 (3d Cir. 1978) which dealt with a pre–indictment phase of the criminal proceedings involving Mr. Eilberg, the Court of Appeals described the relevant billing procedures as follows:

Under the practice of the House, telephone billings for long distance phone service are forwarded to each member by the Clerk. Personal or unofficial calls are noted on the original bills by the Member's office. The original bills are then forwarded to the Office of Finance, accompanied by checks for the unofficial service. The balance, for official service, is then charged to the Member's allowance.

**8.** Reinforcing this conclusion, so the Clerk contends, are parallel indicia of non–justiciability: "a lack of judicially discoverable and manageable standards for resolving [the issue] . . . ," and the "impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government. . . ." *Ibid.*

statute, may not constitutionally police a norm established pursuant to the rule–making authority of the House of Representatives. Indeed, the United States expressly acknowledges in its *Reply to Memorandum Filed by the Clerk of the United States House of Representatives*: "Enforcement of a purely internal House rule by the executive and courts would be an encroachment on the powers of the House, a violation of the separation of powers, and a violation of the textual commitment clause." p. 4. But the United States takes issue with the Clerk's contention that the norm which gives life to the third claim for relief derives only from the word "unofficial" contained in the House rule. The United States contends that a statute–Section 46g of Title 2–authorizes Members of the House of Representatives to charge to the United States only "strictly official long–distance telephone calls...." 2 U.S.C. § 46g.

To this, the Clerk responds that Section 46g, which established a ceiling for "strictly official" chargeable long–distance calls and telegrams of "seventy thousand units" (as they are defined) per Member per session, was superseded by Section 57–the statute, referred to above, which conferred on the Committee on House Administration the authority to "fix and adjust" allowances for, *inter alia*, "telephone and telegraph and other communications." And the date of that supersession, according to the Clerk, was December 15, 1971, when Section 57 came into force–seventeen months before the first of Mr. Eilberg's allegedly false certifications.

The United States does not concur in the Clerk's reading of Section 57. To be sure, the United States apparently does not challenge the proposition that Section 57 removed the seventy–thousand unit ceiling on long–distance telephone calls and telegrams contained in Section 46g, adopting in its stead a discretionary authority vested in the Committee on House Administration to "fix and adjust" telephone and telegraph allowances from time to time. But the United States sees no indication that the enactment of Section 57 operated to repeal the "strictly official" limitation which Section

46g had imposed upon a Member's chargeable long–distance telephone calls and telegrams. That statutory limitation, the United States contends, remains in force to this day.

■ Whether a duly enacted statute is still on the books, or has been superseded by a later statute, is a not uncommon form of legal dispute. But it is relatively uncommon for the disputants to be, respectively the executive branch and the legislative branch (or, as here, one–half thereof). Compare *Kennedy v. Sampson*, 511 F.2d 430 (C.A.D.C.1974). When such a dispute arises in the context of litigation, resolution of the dispute necessarily devolves on the branch of government which participates not at all in the statute–making process: "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (U.S. 1803); *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974).

*"[W]hat the law is" governing telephone calls of Members of the House of Representatives*

The inquiry now to be pursued is whether the Clerk is on sound ground in contending that since December 15, 1971, when Section 57 came into force, no *statute* has prescribed that only the "strictly official" long–distance telephone calls of a Member of the House of Representatives may be charged to the United States. In order to trace out "what the law is" in this respect, a useful beginning point will be the relevant statute law as of the beginning of 1971.

(A) *The relevant statutes as of the beginning of 1971:*

In the beginning of 1971, two statutes dealing with telephone calls by or on behalf of Members of the House of Representatives were part of the so–called "permanent law" of the United States. These were Section 46g and Section 46g–1 of Title 2.

Section 46g, summarized and excerpted from above, warrants rather close scrutiny. It was adopted in 1949, 63 Stat. 265, and amended a number of times between then and 1966. It provided, in pertinent part, as follows:

Until otherwise provided by law, there shall be paid out of the contingent fund of the House of Representatives, in accordance with regulations prescribed by the Committee on House Administration, such amounts as may be necessary to pay—

(1) toll charges on strictly official long–distance telephone calls, and

(2) charges on strictly official telegrams, cablegrams, and radiograms,

made or sent by or on behalf of each Member of the House of Representatives (including the Resident Commissioner from Puerto Rico), other than the Speaker, the majority leader, the minority leader, the majority whip, and the minority whip, aggregating not to exceed seventy thousand units for each session of the House of Representatives. . . .

   \*    \*    \*    \*    \*    \*

For the purposes of this section—

(A) one minute of a long–distance telephone call shall be four units,

(B) one word of a telegram, cablegram or radiogram shall be one unit, except that one word of a night letter shall be one–half unit. . .

Section 46g–1 was rooted in House Resolution 161 of the Ninetieth Congress. That resolution provided as follows:

Effective January 3, 1968, until otherwise provided by law, the Clerk of the House of Representatives shall reimburse each Member, and the Resident Commissioner from Puerto Rico, from the contingent fund of the House of Representatives, not to exceed $300 quarterly for charges for strictly official telephone service incurred outside the District of Columbia, upon submission to the Clerk of a receipt showing payment by such Member or Resident Commissioner of such charges. Any unused portion of each such quarterly allowance shall lapse. The Committee on House Administration shall make such rules and regulations as it deems necessary to carry out this section. The amounts provided in this section shall be in addition to any other amounts provided by law which may be available for payment of such charges.

It appears from the brief House debate, on May 11, 1967, concerning House Resolution 161, that its purpose was to cover "the cost of all telephone service in the home districts"; it did "not pertain to long–distance calls alone, because Members may use credit cards for this. I believe there are enough units to cover that." 113 *Cong. Rec.* 12325.[9] House Resolution 161 seems

9. The entire debate was as follows:
MR. HALL. Mr. Speaker, will the gentleman yield?
MR. FRIEDEL. I am glad to yield to my colleague from Missouri.
MR. HALL. Mr. Speaker, I appreciate the gentleman's yielding.
I should like to ask the gentleman from Maryland why this particular increase, to be provided out of the contingency fund of the House, to be used outside of the District of Columbia, comes up at this particular time; and what is involved; and whether in fact it is needed or not.
MR. FRIEDEL. Reports from many, many Members indicate an increase is very much needed.
The money comes out of the contingency fund until otherwise provided in the budget.
The purpose of this resolution is to reimburse Members for telephone service in their home district, up to $100 a month. There were a number of Members who came before the committee and showed bills of $120 to $140 a month for telephone service, in their districts.
MR. HALL. Mr. Speaker, I ask the gentleman if there is not now a $300–a–quarter allowance provided out of the same fund to cover the same expenses?
MR. FRIEDEL. The $300 quarterly is provided for district office expenses, but it is not sufficient to cover all of the expenses. Many of the Members have to rent typewriters, duplicating machines, and other needed office equipment. We have had statement after statement which showed $700 or $800 a month for official expenses back in home districts.
MR. HALL. Mr. Speaker, I do understand that the $300 quarterly allowance does cover other needed expenses for equipment in the various districts, but I ask the gentleman

not to have been discussed in the Senate. House Resolution 161 was enacted in 1968 as Public Law 90–392, 82 Stat. 318; it was codified as 2 U.S.C. § 46g–1.

(B) *The enactment of 2 U.S.C. § 57 (Pub.L. 92–184, 85 Stat. 636):*

As described above, House Resolution 161 of the Ninetieth Congress, enacted into permanent law in 1968 as Public Law 90–392, 82 Stat. 318, and codified as 2 U.S.C. § 46g–1, provided that each Member of the House of Representatives should be entitled to reimbursement from the contingent fund of the House for up to "$300 quarterly for charges for strictly official telephone service incurred outside the District of Columbia. . . ." The provision was short–lived. In the Ninety–Second Congress, on May 18, 1971, Congressman Frank Thompson, Chairman of the Committee on House Administration, rose to "submit a privileged report (Rept.No.92–206) on the resolution (H.Res. 418), relating to telephone allowances of Members of the House of Representatives, and for other purposes, and ask for immediate consideration of the resolution." 117 *Cong. Rec.* 15598. House Resolution 418 proposed that the permissible reimbursement for "strictly official telephone service incurred outside the District of Columbia" be raised from $300 per quarter–the amount contemplated by House Resolution 161 of the Ninetieth Congress–to $450 per quarter. House Resolution 418 also provided that "effective on the date of enactment of the provisions of this resolution as permanent law, the provisions of such House Resolution 161 are repealed." House Resolution 418 was agreed to by the House without debate. Seven months later–without any intervening mention on the floor of the Senate–House Resolution 418 found its way into an obscure corner of Public Law 92–184, 85 Stat. 627, the "Supplemental Appropriations Act, 1972" which went into force on December 15, 1971: At 85 Stat. 636, under the caption "Administrative Provisions," there were listed by number and title several House resolutions of the Ninety–Second Congress, with the recital that "the provisions of [the listed resolutions] shall be permanent law with respect thereto." House Resolution 418 was among the listed resolutions. House Resolution 418, like the repealed House Resolution 161, made provision for reimbursement "for charges for strictly official telephone service incurred outside the District of Columbia"; apart from some changes required to deal with the special case of the Delegate from the District of Columbia, there was no change of substance other than enlarging the permissible allowance from $300 to $450 quarterly. In the United States Code, House Resolution 418 appears as Section 46g–1 of Title 2, replacing the Section 46g–1 enacted by the Ninetieth Congress which is "deemed repealed."

On July 21, 1971, Congressman Thompson, on behalf of the Committee on House Administration, brought up another "privileged" resolution–House Resolution 457 (117 *Cong. Rec.* 26445):

*Resolved,* That (a) until otherwise provided by law, the Committee on House Administration may, as the committee considers appropriate, fix and adjust from time to time, by order of the committee, the amounts of allowances (including the terms, conditions, and other provisions pertaining to those allowances) within the following categories:

(1) for Members of the House of Representatives, the Resident Commissioner from Puerto Rico, and the Delegate from the District of Columbia–allowances for clerk hire, postage stamps, stationery, telephone and telegraph and other commu-

---

further if he would care to reply as to why the regular telephone allowance cannot be used for other than the installation and monthly rental of the instrument? So far as the cost within the district is concerned, is there anything to preclude using the regular units provided to all Members in the district, whether they telephone from that end on their credit card, or whether they telephone from this end?

MR. FRIEDEL. This resolution does not pertain to long–distance calls alone, because Members may use credit cards for that. I believe there are enough units to cover that.

This is for the cost of all telephone service in the home districts.

nications, official office space and official office expenses in the congressional district represented (including, as applicable, a State, the Commonwealth of Puerto Rico, and the District of Columbia), official telephone services in the congressional district represented, and travel and mileage to and from the congressional district represented; and

(2) for the standing committees, the Speaker, the majority and minority whips, the Clerk, the Sergeant at Arms, the Doorkeeper, and the Postmaster of the House of Representatives–allowances for postage stamps, stationery, and telephone and telegraph and other communications.

(b) The contingent fund of the House of Representatives is made available to carry out the purposes of this resolution.

Congressman Thompson explained the resolution and its rationale as follows (*id.* at 26446):

Mr. Speaker, the resolution before us, House Resolution 457, is very simple and very understandable. It provides that until otherwise provided for by law the Committee on House Administration may as it considers appropriate fix and adjust from time to time by order of the committee amounts of allowances for Members of the House in a number of areas.

The fundamental reason for this is to spare the House the time consumed each session in considering eight or 10 privileged resolutions on these various subjects. For example, when the postal rate increase recently went into effect, the committee computed the percentage increase in postage rates and brought forth a resolution increasing the Members' postal allowances by that percentage increase. After the matter was carefully considered by the Subcommittee on Accounts and the full Committee on House Administration, valuable time of the House was spent in discussing the privileged resolution on that routine housekeeping matter. House Resolution 457 would eliminate the need for coming to the floor a number of times each session with privileged resolutions on postal and other routine allowances.

There are two inherent safeguards in this resolution. As the report indicates, it is the intention of the committee to keep the house informed through the Record of its actions on the day following any such action. Of course, all authorized allowances are dependent upon appropriations, which come under the jurisdiction of the subcommittee chaired by our distinguished colleague from Alabama (Mr. Andrews).

It is a perfectly straightforward resolution, Mr. Speaker, and one which I believe the great majority of the Members will support in order to save their time and in order to modernize a really ancient and absurd practice of bringing to the floor every bit of minutia with respect to the routine daily operations of this side of the Congress.

Unlike House Resolution 418, House Resolution 457 was debated at some length. The opposition view was most cogently put by the Minority Leader of the House, Congressman Gerald R. Ford (117 *Cong. Rec.* 26448–49):

Mr. Speaker, at the outset, let me say I firmly believe that Members of Congress should be adequately paid. Equally Members of Congress ought to have adequate allowances for the proper operation of their offices and for the proper conduct of their responsibilities as Members of the House of Representatives.

I believe, however, those standards in pay and allowances can be better achieved by the method that we have used all the time that I have served. I believe that in the case of pay we could have done it more properly under the procedure we have at the present time. I feel the question of allowances can be properly handled under existing procedure–not under the proposed procedure of House Resolution 457.

Mr. Speaker, I think the present system has worked. With few exceptions the amounts of the various allowances in my judgment are adequate today. They cer-

tainly are infinitely more generous than they have been over the past years. In other words, the House, by the procedure we have at the present time, has increased the number of trips back to the districts where the Congress pays the bill.

The House under the present procedure, has adequately increased the number of units allowable for telephone and telegraph services.

The present system has achieved the objectives which I believe are desirable–adequate pay and adequate allowances.

There are some pitfalls that every Member ought to be warned about in respect to this resolution. Members are turning over to 25 Members the responsibility that 435 Members ought to have. If by chance the committee makes a mistake, those who turned the responsibility over to them will have to bear the responsibility for any errors.

What are the possibilities? We must recognize that what happens in the committee room is not nearly as exposed to the press or to the public as what happens on the floor of the House. Is it not paradoxical that we are demanding more public opportunity to see what goes on in many, many areas, and on this we are in effect changing the rules so there is less public exposure?

In the course of the House debate, no mention was made of any possible overlap between that part of House Resolution 457 which authorized the Committee on House Administration to "fix and adjust" allowances for, *inter alia* "official telephone service in the congressional district represented," and House Resolution 418, approved by the House just two months before, providing for not more than $450 per quarter of reimbursement for "strictly official telephone service incurred outside the District of Columbia." Nor, at any point in the House debate, was any mention made of possible overlap between that part of House Resolution 457 which authorized the Committee on House Administration to "fix and adjust" allowances for, *inter alia*, "telephone and telegraph and other communica-

tions," and the provision in Section 46g for reimbursement for up to seventy thousand units per Member per session for "strictly official long–distance telephone calls, and ... telegrams"; and, in the latter connection, no point was made that the phrase "telephone and telegraph and other communications" in House Resolution 457 was not preceded by "official" or strictly official."

At the conclusion of the debate, House Resolution 457 was adopted by a vote of 233 to 167. It appears not to have been debated in the Senate. Like House Resolution 418, it entered the statute books on December 15, 1971, on the going into force of "Supplemental Appropriations Act, 1972": At 85 Stat. 636, House Resolution 457 ("providing authority to the Committee on House Administration to adjust allowances by order of the Committee for Members, standing committees, leadership offices, and officers of the House") is listed, together with House Resolution 418 and other resolutions, as an enactment which "shall be permanent law...." The United States Code reflects the codification of House Resolution 457 as Section 57 of Title 2.

(C) *Did Section 57 repeal the directive of Section 46g that chargeable long–distance calls be "strictly official"?*

Prior to the enactment in 1971 of Section 57, the United States Code contained two statutes dealing with allowances for telephone service of Members of the House of Representatives: These were the two pre–1971 statutes identified and discussed earlier in this opinion: (1) Section 46g, the 1949 statute which set an aggregate seventy–thousand unit ceiling for "strictly official long–distance telephone calls and ... telegrams," and (2) Section 46g–1, the 1968 statute, which set a $300–per–quarter ceiling for "strictly official telephone service incurred outside the District of Columbia."

Subsequent to the enactment of Section 57, which vested authority over House allowances in the Committee on House Administration, the United States Code–which is published under the authority of the House of Representatives' Judiciary Com-

mittee, 1 U.S.C. § 202–discontinued inclusion of Section 46g. Section 46g–1 remains–but in its 1971 form, rather than the 1968 form which is "deemed repealed." Thus, according to the United States Code, the relevant statutes since December 15, 1971, have been (a) Section 57, conferring authority on the Committee on House Administration to "fix and adjust" allowances for (i) "telephone and telegraph and other communications," and (ii) "official telephone service in the congressional district represented," [10] and (b) Section 46g–1, authorizing up to $450 per quarter for "strictly official telephone service outside the District of Columbia."

The non–inclusion of Section 46g in the post–1971 United States Code appears to bolster the Clerk's contention that Section 46g–and, most particularly, its directive that allowances for Members' long–distance calls be confined to "strictly official" calls–has been repealed. If this is so, it would appear to mean, as the Clerk further contends, that since 1971 there has not been in force any *statute* instructing the House and its Members that toll calls which are not "strictly official" may not be charged to a Member's allowance. And if, since 1971, there has been no *statute*, but merely a House *rule*, embodying the norm of "officialness" as the standard for toll call chargeability, then it would follow that the United States' third claim of relief–that, commencing in 1973, Mr. Eilberg in his monthly reports falsely represented toll calls as "official" in order to avoid reimbursing the United States–is non–justiciable.

Was the editorial judgment of the compilers of the United States Code–dropping Section 46g–soundly based? It presumably rests on an inference that the provision in Section 57 for determination by the Committee on House Administration of allowances for "telephone and telegraph and other communications" was intended to replace the unit–ceiling for long–distance telephone

calls and telegrams contained in Section 46g. One who accepts this not–implausible inference would appear, however, to be led with equal force to the parallel inference that the provision in Section 57 for Committee–determined allowances for "official telephone service in the district represented" had swallowed up the provision in Section 46g–1 for a specified dollar ceiling on "strictly official telephone service incurred outside the District of Columbia." Yet this does not seem to be the view of the compilers of the United States Code, for they have retained Section 46g–1 as one of the statutes in force. But the compilers of the United States Code do not offer any coherent rationale of how Sections 46g–1 and 57 mesh with each other. The one semantic reconciliation which suggests itself is that Section 46g–1 imposes a $450 per quarter upper limit on the discretion which Section 57 vests in the Committee on House Administration to set allowances for "official telephone service in the district represented." But this is belied by the Committee's own interpretation: Effective October 1, 1973, Committee Order Number 7, issued pursuant to Section 57, raised the allowance "for official telephone service outside the District of Columbia"–phraseology almost verbatim that of Section 46g–1–"from $450 quarterly to $600 quarterly." Complementing Committee Order Number 7, and issued on the same day, was Committee Order Number 9, increasing "the number of units provided for official telephone calls, telegrams," etc., "from 80,000 units to 100,000 units, for each regular session of Congress." See Committee Order Number 6 following 2 U.S.C.A. Cum.Supp. § 57. In short, relying on Section 57, the Committee on House Administration has not, like the compilers of the United States Code, treated the quantitative ceiling set by Section 46g as repealed and the quantitative ceiling set by Section 46g–1 as still in force; the Committee has effectively treated both as *functus officio.*

---

**10.** For the 1976 legislation, restoring to the full House most of the Committee's allowance–setting authority, see footnote 6, *supra.*

Does it follow that both Section 46g and Section 46g–1 should be "deemed repealed" by Section 57? To the extent that the question is whether Section 57 has eviscerated both the seventy–thousand unit ceiling of Section 46g and the $450 per quarter ceiling of Section 46g–1, the answer seems plainly to be in the affirmative. But to the extent that the question is whether Section 57 has repealed the "strictly official" limitation contained in both Section 46g and Section 46g–1, a more cautions response is in order.

One line of syntactical analysis would point the way to an affirmative response: This analysis would give weight to the fact that the first reference to telephone service in Section 57–"telephone and telegraph and other communications"–has no prefatory "official," whereas the second reference is to "official telephone service in the congressional district represented." Under these circumstances, so the argument would run, the absence of the limiting "official" in the first provision could not have been unintended. Therefore, the Committee on House Administration would not, since 1971, have been under any *statutory* mandate to equate the chargeability of toll calls and telegrams with their "officialness."

The argument–moderately persuasive on a textual level–loses its edge when the question is asked: What policy objectives would Congress have sought to serve by confining its subsidy of a Member's district telephone services to "official" calls while imposing no such limitation on a Member's toll calls and telegrams? And the question becomes even more pointed when, on re-reading Section 57, one notes that the allowance for "telephone and telegraph and other communications" is the fourth of four categories of allowances, none of which is prefaced by "official"; the preceding three are "clerk hire, postage stamps, stationery. . . ." Intuitively, it would seem improbable that Congress, in enacting Section 57, intended to give the Committee on House Administration authority, by rule, to subsidize a Member's *personal* "clerk hire, postage stamps, stationery, [and] telephone and telegraph and other communications. . . ."

Intuition is, in this instance, confirmed by the relevant legislative history. The House debate, excerpted above, shows that Congressman Thompson and his colleagues on the Committee on House Administration proposed House Resolution 457–which was to become Section 57–as a measure which would channel from the House floor to the Committee room a steady flow of tiresome and inconsequential housekeeping decisions. Conversely, those in opposition, led by Congressman Ford, felt that each Member owed it to taxpayer–constitutents not to shirk personal responsibility for resolving these tedious minutiae. Not a word in the debate suggests that Section 57–whether with respect to long–distance telephone calls or other Member services–was intended to permit the Committee on House Administration to enlarge a Member's *personal* benefits: And it is hardly to be doubted that any perception that Section 57 was so intended would have dramatically intensified and enlarged the opposition.

In considering whether Section 57 should be read as jettisoning the statutory insistence, embodied in Section 46g, that only "strictly official" toll calls should be chargeable to the United States, there is one further aspect of the legislative process which should not be lost sight of. Section 57, like any other statute (including Section 46g), required Senate concurrence to become law. As already noted, there does not appear to have been any Senate floor discussion of Section 57. But it may, nonetheless, be asked whether it would be reasonable to attribute to the Senate, in 1971, an intention to free the House from the statutory norm of "officialness" which had governed the chargeability of the long–distance telephone calls of Members of the House of Representatives since 1949.

To gauge probable Senate policy on this matter, it should be instructive to examine the statutory norms governing the long–distance telephone calls of Senators: The statute in force throughout 1971 was 2 U.S.C. § 46d–4, enacted in 1967. It provided:

Effective January 1, 1968, and thereafter, there shall be paid from the contingent fund of the Senate charges on strictly official long–distance telephone calls when so designated in accordance with rules and regulations prescribed by the Committee on Rules and Administration of the Senate.

Other statutes then governing Senate housekeeping made similar provision for "strictly official telephone service charges incurred outside of the District of Columbia," 2 U.S.C. § 46d–3; for "official Government business paid and collect telegrams," 2 U.S.C. § 46e; and for "strictly official telephone and telegraph communications charges incurred by [Senators] or on their behalf, not exceeding $150 per annum each, to be in addition to reimbursement or payment authority contained in any other law." 2 U.S.C. § 46d–5.

On December 15, 1971, there came into force a statute reciting that "[t]he proviso relating to strictly official telephone service charges incurred by Senators outside the District of Columbia . . . (2 U.S.C. § 46d–3) is repealed," 85 Stat. 635, and that "the Sergeant at Arms shall approve for payment from the contingent fund of the Senate to each Senator, upon his certification . . . telephone services [*sic*] charges officially incurred outside Washington. . . ." 85 Stat. 634. The statute (Public Law 92–184) is the one which, at 85 Stat. 636, wrote House Resolution 457 into "permanent law," codified as Section 57–the section of Title 2 relied on by the Clerk as repealing Section 46g ("strictly official long–distance telephone calls").

On July 10, 1972, Public Law 92–342 repealed 2 U.S.C. § 46d–5, which had authorized up to "$150 per annum" of additional reimbursement for "strictly official telephone and telegraph communications." 86 Stat. 435.

Finally, on October 31, 1972, there came into force Public Law 92–607: Section 506(h) of this statute repealed, effective January 1, 1973, 2 U.S.C. § 46d–4 ("strictly official long–distance telephone calls") and 2 U.S.C. § 46e ("official Government business paid and collect telegrams"). 86 Stat. 1508. Section 506(a) provided (86 Stat. 1505–06):

Effective January 1, 1973, and thereafter, the contingent fund of the Senate is made available for payment to or on behalf of each Senator, upon certification of the Senator, for the following expenses incurred by the Senator and his staff:

(1) official telegrams and long–distance telephone calls and related services (in the manner authorized immediately prior to January 1, 1973, by the Committee on Rules and Administration, or as may be hereafter authorized by that committee);

(2) stationery and other office supplies procured through the Senate stationery room for use for official business;

(3) reimbursement to each Senator for air mail and special delivery postage for expenses incurred in the mailing of postal matters relating to official business;

(4) rental charges for office space at not more than three places designated by the Senator in the State he represents;

(5) reimbursement to each Senator for official office expenses incurred in his State (other than equipment and furniture);

(6) reimbursement to each Senator for telephone service charges officially incurred outside Washington, District of Columbia;

(7) reimbursement to each Senator for charges for subscriptions to magazines, periodicals, or clipping or similar services; and

(8) reimbursement of actual transportation expenses incurred by the Senator in traveling on official business by the nearest usual route between Washington, District of Columbia, and the State he represents and within such State, and actual transportation expenses incurred by employees in that Senator's office subject to the provisions of subsection (e) of this section.

284

Reimbursement to a Senator and his employees under this section shall be made only upon presentation of itemized vouchers for expenses incurred.

Section 506(a) was codified as 2 U.S.C. § 58.

Against this background of Senate housekeeping legislation, it overwhelms credulity to attribute to the Senate in 1971 the intention, via Section 57 of Title 2, to liberate Members of the House from the statutory directive that chargeable long–distance telephone calls be "strictly official."

I therefore conclude–on the basis of the legislative record both in the House and in the Senate–that Members of the House are today, and have been at least as far back as 1949, constrained by a *statutory* norm of "officialness" in determining which credit–card telephone calls are properly chargeable to the United States and, *per contra*, which the United States is entitled to reimbursement for.

ii.

▮▮▮ In the preceding portion of this opinion, I have determined–contrary to the Clerk's submission–that, notwithstanding the enactment of Section 57 of Title 2 in 1971, Section 46g has remained in force as a statutory directive that only the "strictly official" long–distance telephone calls of a House Member may be legitimately charged to the United States. In the extended exposition, on oral argument, of the Clerk's contention that the third claim for relief is non–justiciable, counsel for the Clerk made a final submission which is now to be addressed. The Clerk contends that, even if

"strictly official" is still on the statute books, enforcement through litigation of a statutory norm governing the House's internal housekeeping involves a delegation of House authority to the executive and the judiciary which is incompatible with the separation of powers. The Clerk's position came into sharp focus through the following colloquy (July 25, 1980, Tr. 45–49):

THE COURT: You are not saying that Congress cannot by statute delegate to various parts of Article II starting with the President the authority to do a lot of things that Congress itself could do if it wished to do? You are not saying that?

MR. ROSS: No, but there would be–

THE COURT: But you are saying that if Congress undertakes such a delegation by statute, it can rescind that delegation any time either by joint resolution of both Houses or with respect to matters of the kind we are now talking about, by either House to the extent that–

MR. ROSS: I think we are saying even something more than that,[11] that there are certain areas which the Congress could not delegate and I think a good example would be in the area of punishment. The question came up in regard to the case against former Congressman Helstoski before the Supreme Court last term and the question was whether or not Congress by passage of a statute could have effected a delegation of its inherent authority and responsibility to punish for legislative misconduct to the Courts and to the Executive Branch and

11. The "that" which Mr. Ross was "saying even . . . more than" was reaffirmation of a position advanced earlier in the argument–namely that, during whatever period the "strictly official" standard announced in Section 46g has been on the statute books, the House could, by House resolution, have abrogated the statutory standard, such being an effective exercise of "the House's inherent authority to provide for the services necessary for the Members, an authority which we cited to the explanation by Thomas Jefferson in 1796, and the authority which allows the House to conduct most of its business by resolution." (July 25, 1980, Tr. 35). *That one chamber of Congress could, on the basis of its own appraisal of its "inherent authority," unilaterally put

asunder legislation which both chambers (usually, with the concurrence of the President) wrought, does not seem a self–evident constitutional proposition. The proposition is not, however, one which requires affirmation or rejection here: It is surely the better part of judicial wisdom–and, indeed, of duty–not to seek out constitutional issues which are not plainly presented; it would, therefore, be inappropriate to pursue this issue unless a particular House resolution insistently demonstrated a purpose on the part of the House to overrule a statute or a portion thereof. And, in the present context, no House resolution has been *identified which, by express and unmistakable language, purports to abrogate the "strictly official" limitation in Section 46g.

that was suggested to the Court by the Department of Justice.

The Supreme Court rejected that argument and said that in that case, while they did not comment whether or not such a waiver as it were could ever occur, be it an institutional delegation or an individual's waiver, but they did say that in that statute which was the bribery statute and it was as explicit as could be if one was attempting a delegation since it specifically mentioned members of Congress, that, your Honor, they rejected the notion that such a delegation could occur, that there are areas that we are talking about jurisdiction and much like if this Court did not have jurisdiction to hear a divorce case, simply because the two parties both wished to waive themselves into this court, they would not be able to do so, that the Constitution affects certain jurisdictional allocations and whatever the Congress might now deem it wise to do, that the way to change those jurisdictional allocations is only by constitutional amendment.

\* \* \* \* \* - \*

THE COURT: Are you suggesting that we are today talking about an area that would be constitutionally nondelegable? Are you suggesting that in the Clerk's view Congress couldn't, by an appropriately worded statute, say we want the Department of Justice through civil actions in the Federal Courts to police false claims by members of Congress insofar as those are embodied in certifications that certain phone calls were official matters?

MR. ROSS: We would suggest that by operation of the constitutional principles embodied in the separation of powers embodied in justiciability and embodied in the political question doctrine that we may very well be in such an area, that to involve itself in this determination would force the Court to enter the legislative process to such an extent that it would be necessary to review each phone call made by a member or his staff or out of his office and to set up some standard of what was permissible and what was not permissible, what the House might pay for and what the House might not pay for and that that would be an impermissible injection of this Court into the legislative process.

THE COURT: So you are really taking the position that even if we were all agreed that this is what the House and the Senate and the President all wanted to do, wrote it out in language that none of us could cavil about the purpose of, that would be unconstitutional?

MR. ROSS: We are saying that while is is unnecessary for the Court to reach that question because the statutory basis doesn't exist, we are certainly not in any way embarrassed or afraid to state that that is our belief that's what the Constitution does.

THE COURT: I see. Do we have any examples of judicial determinations that a congressional delegation to one or another of the other branches was constitutionally impermissible as a breach of separation of powers? I know we can all think of venerable law school examples of delegations that were held to be void for vagueness or whatever.

MR. ROSS: I think probably the closest is the Supreme Court's discussion in *Helstoski* [*United States v. Helstoski*, 442 U.S. 477 [99 S.Ct. 2432, 61 L.Ed.2d 12] (1979)] and *Brewster* [*United States v. Brewster*, 408 U.S. 501 [92 S.Ct. 2531, 33 L.Ed.2d 507] (1972)].

The difficulty with the Clerk's position is that the case authority relied on gives it no doctrinal comfort—either directly or by analogy. *United States v. Helstoski* held that the "Speech or Debate" clause ("for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place," *U.S.Const.*, Art. I, § 6) rendered inadmissible, at the trial of a former Congressman charged with taking bribes to bring about the enactment of certain legislation, not only evidence about the actual introduction of proposed legislation, but also "evidence of discussions and correspondence which describe legislative acts . . . ." *United States v. Helstoski,*

*supra*, 442 U.S. at 486, 99 S.Ct. at 2438. The Court did not, in *Helstoski*, determine whether a Member, or the House in the aggregate, could waive the insulation from extra–House inquiry afforded by the "Speech or Debate" clause, for the Court found no persuasive evidence of individual or institutional waiver on the record before it. But the vital aspect of *Helstoski*, as it bears on this case, is its express reaffirmation, 442 U.S. at 487, 99 S.Ct. at 2438–2439 of the pronouncement in *Brewster* that the Speech or Debate clause cordons off only a portion–albeit the core–of a Representative's or Senator's work–life from judicial inquiry; the balance may be the subject of litigation, provided Congress has, by appropriate legislation, undertaken to commit the policing of abuses to the judicial process. The language of the Chief Justice in *Brewster*–taking, as its predicate, Mr. Justice Harlan's opinion for the Court in *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)–is pertinent, both in general and in detail (408 U.S. at 512–13, 524–25, 92 S.Ct. at 2537–2538, 2543–2544):

> *Johnson* thus stands as a unanimous holding that a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts. A legislative act has consistently been defined as an act generally done in Congress in relation to the business before it. In sum, the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts.

> It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so–called "news letters" to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the Court has regarded the protection as reaching only those things "generally done in a session of the House by one of its members in relation to the business before it," *Kilbourn v. Thompson, supra* [103 U.S. 168], at 204 [26 L.Ed. 377], or things "said or done by him, as a representative, in the exercise of the functions of that office," *Coffin v. Coffin*, 4 Mass. 1, 27 (1808).

\*    \*    \*    \*    \*    \*

We would be closing our eyes to the realities of the American political system if we failed to acknowledge that many non–legislative activities are an established and accepted part of the role of a Member, and are indeed "related" to the legislative process. But if the Executive may prosecute a Member's attempt, as in *Johnson*, to influence another branch of the Government in return for a bribe, its power to harass is not greatly enhanced if it can prosecute for a promise relating to a legislative act in return for a bribe. We therefore see no substantial increase in the power of the Executive and Judicial Branches over the Legislative Branch resulting from our holding today. If we underestimate the potential for harassment, the Congress, of course, is free to exempt its Members from the ambit of federal bribery laws, but it has deliberately allowed the instant statute to remain on the books for over a century.

We do not discount entirely the possibility that an abuse might occur, but this

possibility, which we consider remote, must be balanced against the potential danger flowing from either the absence of a bribery statute applicable to Members of Congress or a holding that the statute violates the Constitution. As we noted at the outset, the purpose of the Speech or Debate Clause is to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process. But financial abuses by way of bribes, perhaps even more than Executive power, would gravely undermine legislative integrity and defeat the right of the public to honest representation. Depriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence. Given the disinclination and limitations of each House to police these matters, it is understandable that both Houses deliberately delegated this function to the courts, as they did with the power to punish persons committing contempts of Congress. 2 U.S.C. § 194.

In short, as against the Clerk's separation–of–powers concerns, the prevailing congressional practice has for several decades been to delegate much of the policing of the behavior of Senators and Representatives to the executive and the judiciary.[12] And such delegation has been uniformly sustained by the Supreme Court–subject only to the constraints imposed by the "Speech or Debate" clause on judicial inquiry into "legislative acts." Among the several instances of judicial inquiry sus-

tained by the Court, one of them–*United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955)–is, in the current context, particularly instructive. *Bramblett* was a criminal prosecution under 18 U.S.C. § 1001, in which a former Representative was charged with "having falsely represented to the Disbursing Office of the House of Representatives that a named woman was entitled to compensation as his official clerk." 348 U.S. at 509, 75 S.Ct. at 508. As characterized by the Chief Justice in *Brewster* (in a footnote cataloguing proceedings pursued by the United States to which the "Speech or Debate" clause proved no obstacle), "*Bramblett* concerned a Congressman's misuse of office funds via a 'kick–back' scheme, which is surely related to the legislative office." 408 U.S. at 522, 92 S.Ct. at 2542.

Wherefore, I conclude that the United States' third claim for relief is justiciable. And, for that reason, the Clerk of the House of Representatives will have to comply with the subpoena of the United States.

### III.

For the reasons set forth in Sections I and II of this opinion, an order has entered (1) denying, in its entirety, Mr. Eilberg's motion to dismiss the compliant, and (2) granting the motion of the United States for a determination of materiality and relevancy.[13]

---

**12.** On occasion, a chamber of Congress has conducted its own policing of matters also pursued in court. A very recent instance is the House's expulsion, on October 2, 1980, of Michael J. Myers, who was in his second term representing a district in south Philadelphia. Mr. Myers had, on August 30, 1980, been convicted of, *inter alia*, receiving, and conspiring to receive, substantial sums of money in connection with his performance of an "official act," in violation of 18 U.S.C. §§ 201(c) and (g), and § 371. And cf. *In Re Application of National Broadcasting Company, United States v. Myers*, 635 F.2d 942 (2d Cir. 1980).

**13.** The granting of this motion resolves the over–all question of justiciability; it is not to be understood as precluding the Clerk from questioning the "materiality" and/or "relevancy" of particular documents falling within the letter of the United States' broad subpoena. Nor is the granting of the motion to be understood as precluding the Clerk, or Mr. Eilberg, from raising such particularized "Speech or Debate" contentions as may be thought to render some proposed evidence inadmissible.