UNITED STATES of America ex rel. Alan Roy HOLLANDER, Plaintiff,

v.

William CLAY, Defendant.

Civ. A. No. 76–493.

United States District Court, District of Columbia.

Oct. 1, 1976.

Robert L. Ashbaugh, U. S. Dept. of Justice, Civ. Div., Fraud Section, Washington, D. C., for United States.

Shellie F. Bowers, Washington, D. C., for defendant Clay.

## MEMORANDUM OPINION AND ORDER

FLANNERY, District Judge.

This matter is before the court on defendant's motion to dismiss under Rule 12(b) of the *Federal Rules of Civil Procedure.* On March 26, 1976, Alan Roy Hollander, a private citizen, filed this action to recover double damages and forfeitures from the defendant, Congressman William L. Clay of the First Congressional District of Missouri, under the False Claims Act, 31 U.S.C. §§ 231–35. Under this statute, a private citizen may initiate a suit on behalf of the United States subject to an election by the Department of Justice to assume responsibility for the continuance of the litigation.

31 U.S.C. § 232. The original complaint charged defendant with submitting false travel vouchers to the clerk of the House of Representatives to obtain reimbursement for automobile trips between Washington, D. C. and St. Louis, Missouri; defendant allegedly either inflated the cost of the trips or did not take the trips at all.

The Department of Justice elected to take over the case from Hollander on June 4, 1976, and it filed an amended complaint June 18, 1976. The amended complaint added two new theories of recovery in addition to the False Claims Act count: common-law unjust enrichment and monies paid under mistake of fact.

According to the complaint, every member of Congress is entitled to reimbursement for travel between his home Congressional district and Washington, D. C. out of the contingent fund of the House of Representatives. This contingent fund consists of federal monies drawn on the United States Treasury pursuant to the appropriation act for the legislative branch. Plaintiff contends that defendant received payment for approximately 90 travel claims submitted between 1970 and 1975 in which defendant misrepresented the occurrence of travel, misrepresented the mode of transportation, and inflated the amount of money due him.

Defendant now seeks to dismiss the action. He claims that this suit is barred on four grounds: (1) the Speech or Debate clause; (2) the article 1, section 5 provision of the Constitution relating to punishment and expulsion of members of Congress; (3) the political question doctrine; and (4) the provisions of the statute relating to payments out of the contingent fund, 2 U.S.C. § 95. Each of the claims will be examined in turn.

I

 Article 1, section 6 of the Constitution provides that "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." Defendant argues that reimbursement of travel expenses represents Congressional acknowledgement of a task, representation of and communication with a constituency, that is fundamental to a legislator's job and thus protected by the Speech or Debate clause. Indeed, the privilege or immunity to be afforded by the Speech or Debate clause should be read broadly to provide some practical security against interference or intimidation by the executive and accountability before a possibly hostile judicial branch. *Gravel v. United States,* 408 U.S. 606, 617, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *United States v. Johnson,* 383 U.S. 169, 181, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). Generally, the conduct of a member of Congress is not subject to judicial review or made the basis of a civil or criminal judgment where that conduct is within the sphere of legitimate legislative activity. *Gravel v. United States, supra,* 408 U.S. at 624, 92 S.Ct. 2614; *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

 The protection of the Speech or Debate clause, however, does not extend beyond those activities construed as legislative acts; not everything that members of Congress do, even in their official capacities, can be classified as protected legislative acts. *Doe v. McMillan,* 412 U.S. 306, 313, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States, supra,* 408 U.S. at 624–25, 92 S.Ct. 2614; *United States v. Brewster,* 408 U.S. 501, 528, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). The Supreme Court has defined a legislative act as one constituting

an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. . . . courts have extended the privilege to matters beyond pure speech or debate in either House, but "only when necessary to prevent indirect impairment of such deliberations."

*Gravel v. United States, supra,* 408 U.S. at 625, 92 S.Ct. at 2627. In *United States v. Brewster,* the Court listed a number of activities performed by legislators not protected by the Speech or Debate clause, including a

> wide range of legitimate "errands" performed for constituents . . . preparing so-called "news letters" to constituents . . . . Although these are entirely legitimate activities, they are political in nature rather than legislative
> . . . .

408 U.S. at 512, 92 S.Ct. at 2537. This passage makes clear that contact with constituents is not the type of activity designed to fall under the Speech or Debate clause's protection.

■ In the instant case, it is clear that the constituent communication aspect of the travel vouchers does not constitute the type of legislative activity defined by the cases to be within the clause. Moreover, this case does not directly involve defendant's communication with his constituents, but rather merely the allegedly false filing of travel vouchers. Defendant alternatively argues that the act of being paid, whether as salary or as reimbursement for travel expenses, represents a fundamental part of the job of a legislator and is thus protected. The court finds this contention similarly unpersuasive because of the pay function's dubious connection with the deliberative and communicative processes that make up protected legislative activities.

## II

Article I, section 5, clause 2 of the Constitution provides: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." Defendant argues that this power to punish or expel is exclusive, plenary, and nonreviewable, citing *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). *Powell* does not support defendant's contention, however; in fact, the Court expressly reserved the issue of what limits may exist to Congress' power

to expel or otherwise punish a member of Congress. *Id.* at 507 n.27, 89 S.Ct. 1944.

■ Defendant more significantly misconstrues the scope of the punishment or expulsion clause. The present suit seeks neither the expulsion nor the punishment of defendant; it is in the nature of a civil, remedial action. The Department of Justice, in seeking return of funds alleged to have been procured by misrepresentations, cannot be said to be invading Congress' prerogative to punish or expel. Congress retains that option in this case unaffected by defendant's potential civil liability. That members of Congress were intended to be within the scope of the False Claims Act has been long settled. In *United States v. Bramblett,* the Supreme Court considered a charge that defendant Congressman had falsely and fraudulently represented to the House Disbursing Office that a certain woman was entitled to compensation as his official clerk:

> It would do violence to the purpose of Congress to limit the section to falsifications made to the executive departments. Congress could not have intended to leave frauds such as this without penalty. The development, scope and purpose of the section shows that "department," as used in this context, was meant to describe the executive, legislative and judicial branches of the Government.

348 U.S. 503, 509, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). This clear exposition of the scope of the False Claims Act's applicability further bolsters the conclusion that article 1, section 5 presents no barrier to a civil suit against a member of Congress.

## III

■ Defendant next argues that the present suit is barred by the political question doctrine. He suggests that the article 1, section 5 punishment or expulsion clause represents a textually demonstrable commitment to Congress of the power to punish its members for any alleged wrongdoing. The political question doctrine involves a justiciability inquiry hinging on conceptions of separation of powers between the legisla-

tive, executive, and judicial branches. As formulated by the Supreme Court in *Baker v. Carr,* a prominent attribute of a political question is a "textually" demonstrable constitution commitment of the issue to a coordinate political department. . . . 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Defendant does not claim under any of the other common categories of political question, such as lack of judicially discoverable standards, necessity for initial policy determination, lack of respect for a coordinate branch, embarrassment by multifarious pronouncements by different branches, or unusual need for unquestioning adherence to a political decision already made. *See id.*

This court's inquiry thus hinges on whether there is a textually demonstrable commitment of a Congressman's liability under the False Claims Act to another branch of government. Defendant suggests that the article 1, section 5 punishment or expulsion clause provides such a commitment. As noted above, however, plaintiff's case is civil in nature and does not impinge upon the House's prerogative to punish its members. Defendant can point to no textually demonstrable commitment to the House of adjudicatory power to determine defendant's civil liability. Cf. *Powell v. McCormack, supra,* 395 U.S. at 548, 89 S.Ct. 1944 (narrow interpretation of Congress' article 1, section 5 power to determine qualifications of members despite political question doctrine claim). Moreover, in the present case, no impediments exist to judicial determination: "the duty asserted can be judicially identified and its breach judicially determined, and . . . protection for the right asserted can be judicially molded." *Baker v. Carr, supra,* 369 U.S. at 198, 82 S.Ct. at 700.

### IV

Defendant, finally, asserts a statutory bar to the present action under 2 U.S.C. § 95. That statute provides:

No payment shall be made from the contingent fund of the House of Representatives unless sanctioned by the Committee on Accounts of the House of Representatives. Payments from the contingent fund made upon vouchers approved by said committee shall be deemed, held, and taken, and are hereby declared to be *conclusive* upon all the departments and officers of the Government. (emphasis supplied)

Defendant argues that the term "conclusive" precludes any action by the Department of Justice with regard to the disbursements in question since they came from the contingent fund of the House of Representatives. Plaintiff suggests that this statute precludes only such government action as a predisbursement audit by the Department of the Treasury. In order more fully to assess the claims made by each side, a review of the history surrounding enactment of this statute is appropriate.

The language of the present statute derives principally from an 1888 appropriations act of Congress. That act stated:

Hereafter, no payment shall be made from the contingent fund of . . . the House of Representatives unless sanctioned by the Committee on Accounts of the House of Representatives. And hereafter payments made upon vouchers approved by the aforesaid respective committees shall be deemed, held, and taken, and are hereby declared to be conclusive upon all the departments and officers of the Government . . . .

Act of Oct. 2, 1888, ch. 1069, 25 Stat. 546. The genesis of the term conclusive, as used in the 1888 statute, requires a short consideration of the historical relationship between Congress and the Treasury. Congress in 1789 created an executive department to manage and disburse monies and to assure the propriety of such disbursements. Act of Sept. 2, 1789, ch. 12, §§ 2–3, 1 Stat. 65. The Speaker of the House of Representatives initially determined the per diem compensation and travel allowances of members of Congress, but he had to certify his figures to the Department of the Treasury in order to obtain actual disbursement of funds. Act of Sept. 22, 1789, ch. 17, § 6, 1 Stat. 71, *supplanted by* Act of Jan. 22,

1818, ch. 5, § 3, 3 Stat. 404. As might be expected, this arrangement led to some friction between a Congress determined to be independent from the executive and a Treasury determined to audit questionable expenditures before authorizing payment.

In 1849 the Secretary of the Treasury questioned certain duly certified expenditures to pay mileage of senators attending a special meeting. When the Secretary declined payment, the Attorney General issued an opinion interpreting the 1818 statute to mean that a properly certified claim was "conclusive" on the Treasury Department and not subject to audit. 5 Op.Att'y Gen. 191, 199–203 (1849). Soon thereafter the word conclusive appeared in the statutory formulation for the first time. The Act of Sept. 30, 1850, concerning members' per diem and travel allowances, provided:

> And it is hereby declared that, according to the true interpretation of the [1818 Act] . . . all certificates which have been or may be granted by the presiding officers of the . . . House of Representatives . . . are, and ought to be, deemed, held, and taken, and are hereby declared to be, conclusive upon all the departments and officers of the government of the United States.

Ch. 90, 9 Stat. 523. The authority over all House expenditures was transferred from the Speaker to the Committee on Accounts in 1864. Act of Mar. 14, 1864, ch. 30, 13 Stat. 26. Finally, in 1888, Congress amended the provision to make approval by the Committee on Accounts conclusive for all payments from the contingent fund. Act of Oct. 2, 1888, ch. 1069, 25 Stat. 546. Attempts by the Treasury to question or audit House expenditures since 1850 have proven unsuccessful. See 2 Dec.Comp.Treas. 24, 25 (1890); 9 Op.Att'y Gen. 167, 169 (1858).

This review of the history behind the present statute's use of the term conclusive provides impressive evidence that the Treasury must honor properly presented claims on the House's contingent fund. It does not answer, however, the question of whether the statute should be read to bar a later claim by the Justice Department that certain payments were obtained by fraud or misrepresentation. Defendant suggests that the answer to this question lies in the plain words of the statute itself: "conclusive upon all the departments and officers of the Government." Certainly the Justice Department qualifies as such a department. Such an interpretation of the statute is beguiling in its simplicity, but so to construe it would require the court to ignore the circumstances leading to the enactment of the statutory language. Those circumstances suggest that the term conclusive meant only that the Treasury must honor the request of a coordinate branch of government for disbursement of funds. In the present case, the Treasury has so honored the contingent fund claim and defendant has been paid. Yet even as to the Treasury, the statute has never been construed to prohibit that department from withholding payment where "payment out of the contingent fund be prohibited by law." 9 Op.Att'y Gen. 167, 169 (1858).

■ Several other considerations lead the court to the conclusion that the statute in question should not bar the present action. Defendant presents no evidence to show that Congress, in choosing the statutory language, considered the issues presented by the instant suit, had any legislative purpose pertaining to such issues, or intended so to protect members of Congress. His claim is based on a reading of the naked statute alone. By contrast, plaintiff notes that Congress specifically has delegated to the Justice Department authority to investigate, initiate, and conduct cases under the False Claims Act. 31 U.S.C. § 233. As previously noted, the False Claims Act envisions members of Congress as defendants. *United States v. Bramblett,* 348 U.S. 503, 509, 75 S.Ct. 504, 99 L.Ed. 594 (1955). Defendant presents no compelling reason to deviate from this established law and practice. Thus the court concludes that the provisions of the contingent fund statute, 2 U.S.C. § 95, presents no bar to the present suit.

■ Having rejected all four of defendant's grounds to dismiss, the court must

deny his motion. At oral hearing on this motion, defendant's attorney requested that, in the event his motion to dismiss was denied, the court consider certification of the issues raised to the Court of Appeals under 28 U.S.C. § 1292(b). That question is now before the court. The Judicial Code provides a mechanism whereby a district court may certify a proper issue to the Court of Appeals before final decision in the case. Section 1292(b) provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The section sets out two requirements: this court must believe both that the issues decided by this order involve a close, controlling issue of law and that an appeal at this time could advance the final outcome of this litigation. Certification under section 1292(b) is far from the normal course of procedure. The federal scheme in general evidences a policy against piecemeal appeals. *See Switzerland Cheese Assoc., Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 24–25, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); *Baltimore Contractors, Inc. v. Bodinger,* 348 U.S. 176, 178, 75 S.Ct. 249, 99 L.Ed. 233 (1955); 28 U.S.C. §§ 1291, 1292(a).

██ In determining whether defendant presents a controlling question of law, the court is mindful of the Ninth Circuit's interpretation of that issue:

The legislative history of subsection (b) of section 1292 . . . indicates that it was to be used only in extraordinary cases where decision of an interlocutory appeal might avoid protracted and expensive litigation. It was not intended merely to provide review of difficult rulings in hard cases.

*United States Rubber Co. v. Wright,* 359 F.2d 784, 785 (9th Cir. 1966). The fact that there are no cases interpreting the provisions of 2 U.S.C. § 95, as applicable to this case, does not necessarily create substantial grounds for difference of opinion. *See Barrett v. Burt,* 250 F.Supp. 904, 907 (S.D.Iowa 1966). While certainly the ultimate termination of this litigation would be advanced if the Court of Appeals heard and sustained defendant's defense at this time, the court is not of the opinion that this is a likely course of events. Therefore, the court will not invoke its discretionary authority to certify the issues decided in this order to the Court of Appeals under section 1292(b).

Accordingly, it is, by this court, this 30th day of September, 1976,

ORDERED that defendant's motion to dismiss be, and hereby is, denied; and it is further

ORDERED that defendant's request for certification of the issues raised in this order to the Court of Appeals under 28 U.S.C. § 1292(b) be, and the same hereby is, denied; and it is further

ORDERED that plaintiff's pending Motion For an Order Directing Issuance of a Subpoena shall be argued before this court on October 12, 1976 at 2:00 p. m.