**UNITED STATES of America ex rel. Joel D. JOSEPH, and Joel D. Joseph, Appellants,**

v.

**Howard W. CANNON et al.**

**No. 78–1618.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1979.

Decided Jan. 30, 1981.

---

Joel D. Joseph, Washington, D.C., with whom Paul D. Kamenar, Washington, D.C., was on the brief, pro se.

Kevin T. Maroney, Washington, D.C., with whom Edward P. Morgan, Washington, D.C., was on the brief, for appellees.

Before ROBINSON and MacKINNON, Circuit Judges, and HAROLD H. GREENE, District Judge.*

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal challenges the District Court's disposition of a somewhat novel suit brought by Joel D. Joseph, the appellant, against Senator Howard W. Cannon and his administrative assistant, Chester B. Sobsey, the appellees. Initiated pursuant to Section 231 of the False Claims Act,[1] the litigation features two counts respectively charging that Senator Cannon authorized payment of Sobsey's federal salary during a period when Sobsey was working "extensively and exclusively" on the Senator's 1976 reelection campaign,[2] and that other members of the Senator's staff performed personal services for him and his family while collecting their governmental salaries.[3] The District Court dismissed the first count for lack of jurisdiction,[4] and the second for failure to state with sufficient specificity a claim upon which relief could be granted.[5]

While we depart from aspects of the District Court's analysis, we agree that the False Claims Act does not empower the federal courts to address appellant's first claim,[6] and that the vagueness of appellant's complaint is fatal to the second.[7] We accordingly affirm the District Court's judgment in both respects.

## I. BACKGROUND

Howard W. Cannon is a United States Senator from the State of Nevada. At all times relevant to this case, Chester B. Sobsey was a Senate employee serving as his administrative assistant. In 1969, Senator Cannon, compliably with then Senate Rule 43,[8] filed a written designation with the Secretary of the Senate authorizing Sobsey to solicit, receive, distribute, and act as custodian of the Senator's campaign funds.

According to appellant, however, Sobsey did far more for the 1976 Cannon campaign than administer contributions. From March, 1975, through November, 1976, Sobsey allegedly worked "extensively and exclusively" for the Senator's reelection.[9] Throughout this period, the complaint avers, "Sobsey accepted his regular pay for services ostensibly performed as Senator Cannon's administrative assistant even though such services were not performed or [were] performed in a perfunctory or nominal manner."[10] Appellant maintains that

---

\* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. 31 U.S.C. § 231 (1976), quoted in relevant part *infra* note 22.

2. *Appellant's Complaint (Complaint)* ¶¶ 8, 9, Appendix to Brief for Appellant (App.) 8.

3. Complaint ¶ 10, App. 8.

4. *United States ex rel. Joseph v. Cannon*, Civ. No. 77–0452 (D.D.C. May 25, 1978) (memorandum and order), at 1–2, App. 4–5. In the court's view, the jurisdictional barrier was 31 U.S.C. § 232 (1976), quoted in relevant part in text *infra* at note 29.

5. *United States ex rel. Joseph v. Cannon, supra* note 4, at 2, App. 5.

6. Discussed in Part III *infra*.

7. Discussed in Part II *infra*.

8. For the text of Rule 43, see note 32 *infra*. During the period here in question, this rule remained as adopted in 1968. See S. Jour. 247, 90th Cong., 2d Sess., Mar. 22, 1968. A minor amendment was effected by the Senate in 1977, and the provision was renumbered Rule 49. See note 32 *infra*.

9. Complaint ¶ 8, App. 8.

10. *Id.* ¶ 9, App. 8. Because the first paragraph states that Sobsey worked "exclusively" on Senator Cannon's reelection campaign, whereas the second paragraph suggests that Sobsey actually continued to perform his administrative tasks during the period in question, albeit in a "perfunctory or nominal manner," the two allegations appear to be inconsistent. For purposes of determining the propriety of the District Court's dismissal, however, we must view the complaint in the light most favorable to appellant. *Jenkins v. McKeithen*, 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404, 416–417 (1969); 5 C. Wright & A. Miller, Federal Practice § 1357 (1969). We accordingly disregard any inconsistency.

Senator Cannon was aware of the nature of his assistant's activities, yet authorized these salary payments.[11] Appellate further asserts that at unspecified times other unnamed members of the Senator's staff rendered personal services to the Senator and his family.[12]

Invoking the False Claims Act, appellant brought suit against Senator Cannon and Sobsey in the District Court for recovery, on behalf of the United States, of double the damages allegedly sustained by the federal treasury plus $2,000 for each claim made,[13] and punitive damages of $50,000 from each.[14] For himself, as relator or *qui tam* plaintiff, he asked "fair and reasonable compensation,"[15] and reimbursement for the expenses of the litigation.[16] The United States declined to participate in the suit, and appellees moved to dismiss the complaint. The District Court granted the motion,[17] and this appeal followed.

11. Complaint ¶ 9, App. 8.

12. *Id.* ¶ 10, App. 8.

13. Complaint, Prayers for Damages ¶ 1, App. 8. See 31 U.S.C. § 231 (1976).

14. Complaint, Prayers for Damages, ¶ 1, App. 8–9.

15. *Id.* ¶ 2, App. 9.

16. *Id.* See 31 U.S.C. § 232(E)(2) (1976); note 25 *infra.*

17. *United States ex rel. Joseph v. Cannon, supra* note 4, at 1–2, App. 4–5.

18. Complaint ¶ 8, App. 8.

19. Quoted in relevant part in text *infra* at note 29.

20. *United States ex rel. Joseph v. Cannon, supra* note 4, at 1–2, App. 4–5.

21. Although the issue has not been raised before us by the parties, this action arguably is barred by the Speech or Debate Clause, U.S. Const., art. 1 § 6. See *Davis v. Passman*, 442 U.S. 228, 247, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846, 863 (1979) (discussing but not deciding Speech or Debate issue); *Consumers Union v. Periodical Correspondents' Ass'n*, 169 U.S.App. D.C. 370, 379–380, 515 F.2d 1341, 1350–1351 (1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976); *United States ex rel.*

## II. THE COUNT ONE CLAIM

Appellant theorizes that Senator Cannon's authorization of salary payments to Sobsey while the aide was not performing "official legislative and representational duties" made out an actionable false claim.[18] The District Court held that the Government already possessed the information set forth in appellant's complaint, and that the action was barred by Section 232(C) of the Act[19] for that reason.[20] Although an examination of the language and purposes of that provision convinces us that the court's interpretation was incorrect, we are persuaded that dismissal of appellant's first count was nonetheless proper.[21]

### A. *The Requirements of Section 232(C)*

■ The False Claims Act[22] was adopted during the Civil War, a time when massive frauds were being committed against the Government.[23] To encourage action against defrauders,[24] Congress authorized private

*Hollander v. Clay*, 420 F.Supp. 853 (D.D.C. 1976). In light of our construction of the False Claims Act *vis-a-vis* the claims in suit, we do not reach that question.

22. The liability provision of the False Claims Act presently reads:

Any person ... who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, ... shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

31 U.S.C. § 231 (1976).

23. See Report of the Special Committee on Government Contracts, H.R.Rep. 2, 37th Cong., 2d Sess. 1–2 (1861).

24. On the broad range of situations covered by the Act, see, *e.g., Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996, 999 (1958); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir.), *cert. denied*, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975); *Alperstein v.*

citizens to bring civil actions against wrong-doers on the Government's behalf, and to retain half of any recovery.[25] The Act's original language permitted a plaintiff to launch a suit and collect his share of the damages even when he contributed absolutely nothing to exposure of the crime,[26] however, and this provision was much abused in later years by piranha-like plaintiffs who sued solely on the basis of information already contained in governmental files and indictments.[27] The Act was therefore amended in 1943 [28] to permit only those persons unveiling new information to sue:

> The court shall have no jurisdiction to proceed with any such suit brought under clause (B) of this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought. . . . [29]

The District Court concluded that appellant had not surmounted this statutory barrier because the Secretary of the Senate had in his files Senator Cannon's written designation of Sobsey to administer campaign contributions.[30] We cannot, however, subscribe to this holding. Merely because the Government holds some information related to an allegedly false claim does not mean that suit under the Act is barred by Section 232(C). As the Ninth Circuit has trenchantly observed:

> To require that the evidence and information possessed by the United States be a mirror image of that in the hands of the qui tam plaintiff would virtually eliminate the bar. On the other hand, to permit the bar to be invoked when the United States possesses only rumors while the qui tam plaintiff has evidence and information would be to permit the bar to repeal effectively much of the False Claims Act. Between these extremes lies the answer.

> More precisely, the answer rests in that area where it is possible to say that the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute.[31]

The question, properly, then, is whether the information conveyed by the designation transmittal to the Secretary of the Senate could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing; quite obviously it could have had no such effect. The designation, filed in accordance with then Senate Rule 43(1),[32] revealed only

United States, 291 F.2d 455, 456 (5th Cir. 1961); United States ex rel. Hollander v. Clay, supra note 21, 420 F.Supp. at 858; United States v. Fowler, 282 F.Supp. 1, 2 (E.D.N.Y.1968).

**25.** If the plaintiff—whether the United States or a private citizen—wins a False Claims Act suit, the defendant must remit double the amount of money falsely paid plus $2,000 for each claim made. 31 U.S.C. § 231 (1976). Originally, a private plaintiff was entitled to one-half of any recovery. Act of Mar. 2, 1863, ch. 67, § 6, 12 Stat. 698. As the statute now stands, successful private plaintiffs may collect "an amount, not in excess of one-fourth of the proceeds of such suit or any settlement thereof, which in the judgment of the court is fair and reasonable compensation . . . ," plus reasonable and necessary expenses. 31 U.S.C. § 232(E)(2) (1976).

**26.** See United States ex rel. Marcus v. Hess, 317 U.S. 537, 545, 63 S.Ct. 379, 385–386, 87 L.Ed. 443, 450–451 (1943).

**27.** H.R.Rep.No.263, 78th Cong., 1st Sess. 2 (1943) (letter from Attorney General Biddle). See also, 89 Cong.Rec. 2800–2801, 78th Cong., 1st Sess. (1943).

**28.** Act of Dec. 23, 1943, ch. 377, § 1, 57 Stat. 608. See H.R.Rep.No.263, 78th Cong., 1st Sess. (1943).

**29.** 31 U.S.C. § 232(C) (1976).

**30.** United States ex rel. Joseph v. Cannon, supra note 4, at 1–2, App. 4–5.

**31.** Pettis ex rel. United States v. Morrison-Knudsen Co., 577 F.2d 668, 674 (9th Cir. 1978).

**32.** No officer or employee whose salary is paid by the Senate may receive, solicit, be the custodian of, or distribute any funds in connection with any campaign for the nomination for election, or the election of any individual to be a Member of the Senate or to

that Sobsey was authorized to solicit and handle campaign contributions. And because Sobsey could have discharged this function without neglecting his official duties in any way, the Rule 43 filing by itself cannot be deemed to have adequately informed the Government of possible wrongdoing by either Senator Cannon or his aide. Only when combined with appellant's allegation that Sobsey completely disregarded his duties as the Senator's administrative assistant does any possibility of a cause of action emerge. This case thus differs radically from those where the Government possessed comprehensive and crucial evidence prior to initiation of a Section 231 suit.[33] Since the information the Government derived from the Senator's designation was innocuous by itself, we conclude that Section 232(C) does not apply and that the District Court improperly predicated its dismissal of count one upon that provision.

## B. *Liability Under the Act*

■ Although we thus disagree with the District Court's jurisdictional analysis, we are nevertheless constrained to hold that dismissal of appellant's first count was appropriate. We recognize, of course, that a motion to dismiss for failure to state a claim should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of this claim which would entitle him to relief." [34] But the stark fact of the matter is that the construction of the Act for which appellant contends—the only construction through which appellant could hope to achieve victory—would require us to venture far beyond the limits of acceptable judicial action. Consequently, we decline to read the Act as proscribing the particular conduct alleged in appellant's complaint.

## 1. *Limits on Judicial Power*

■ We approach our interpretation of the False Claims Act mindful of long-established principles governing the scope of judicial power in our constitutional scheme. We maintain, too, a candid recognition of functional limitations on the ability of the judiciary to deal with certain types of problems. Constitutionally speaking, federal courts may decide only "cases" and "controversies," [35] and while neither of these terms has proven susceptible to precise definition,[36] the courts traditionally have refused to undertake decisions on questions that are ill-suited to judicial resolution.[37] This concept of justiciability appears in many guis-

---

any other Federal office. This prohibition does not apply to any assistant to a Senator who has been designated by that Senator to perform any of the functions described in the first sentence of this paragraph and who is compensated at a rate in excess of $10,000 per annum if such designation has been made in writing and filed with the Secretary of the Senate. The Secretary of the Senate shall make the designation available for public inspection.

Standing Rules for Conducting Business in the Senate of the United States, Senate Manual, S.Doc.No.94–1, 94th Cong., 1st Sess. 69 (1975), amended and renumbered as S. Rule 49, S.Res. 188, 95th Cong., 1st Sess. (1977). The 1977 amendment limited to two the number of staff members a Senator may authorize to administer campaign funds; otherwise the substance remained intact. See note 64 *infra* and accompanying text.

33. See, *e.g., United States ex rel. Thompson v. Hays*, 432 F.Supp. 253, 255–256 (D.D.C.1976); *United States ex rel. McCans v. Armour & Co.*, 146 F.Supp. 546, 549 (D.D.C.1956), *aff'd*, 102

U.S.App.D.C. 391, 254 F.2d 90, *cert. denied*, 358 U.S. 834, 79 S.Ct. 57, 3 L.Ed.2d 71 (1958); *United States v. Aster*, 176 F.Supp. 208, 210 (E.D.Pa.1959), *aff'd*, 275 F.2d 281 (3d Cir.), *cert. denied*, 364 U.S. 894, 81 S.Ct. 223, 5 L.Ed.2d 188 (1960).

34. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). Accord, *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974); *Phillips v. Bureau of Prisons*, 192 U.S.App.D.C. 357, 359, 591 F.2d 966, 968 (1979); *Alley v. Dodge Hotel*, 163 U.S.App.D.C. 320, 323, 501 F.2d 880, 883 (1974). See 5 C. Wright & A. Miller, *supra* note 10, at § 1357.

35. U.S.Const., art. III, § 2, cl. 1.

36. See *Flast v. Cohen*, 392 U.S. 83, 94–97, 88 S.Ct. 1942, 1949–1951, 20 L.Ed.2d 947, 958–960 (1968).

37. See the discussion in 13 C. Wright, A. Miller & E. Cooper, Federal Practice § 3529 (1975).

es,[38] and traces its origins both to inherent limitations on the capabilities of judicial tribunals as well as to the separation-of-powers concerns central in our system of government.[39]

So it is that so-called political questions are denied judicial scrutiny, not only because they invite courts to intrude into the province of coordinate branches of government,[40] but also because courts are fundamentally underequipped to formulate national policies or develop standards of conduct for matters not legal in nature.[41] A challenge to the interworkings of a Senator and his staff member raises at the outset the specter that such a question lurks,[42] and it is to an investigation of that possibility that we first turn.

### 2. Lack of Judicially Discernible Rules or Standards

Although the precise boundaries of the political-question doctrine are obscure, " '[i]n determining whether a question falls within [that] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations.' "[43] Prominent characteristics of political questions are

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government. . . [44]

We perceive no "textually demonstrable commitment" of the issue before us to any other branch of the Federal Government.[45] Nor do we believe that judicial review of congressional employment decisions necessarily involves a "lack of the respect due coordinate branches of government."[46] We do find, however, a complete absence "of judicially discoverable and manageable standards for resolving" the question whether Senators may use paid staff members in their campaign activities.

### a. Lack of Statutory, Administrative and Case Law

Appellant cites no judicial decision or administrative ruling, nor has our own research revealed any, establishing a standard to guide a court in determination of the issue generated by the first count of the complaint. Nor have we encountered any statute affording that kind of assistance.[47] It is true that "sums appropriated for the various branches of expenditure in the public service" are statutorily confined "to the objects for which they are respectively made," and consequently are available "for

---

38. See id.

39. See id.

40. See Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686 (1962); Sanders v. McClellan, 150 U.S.App.D.C. 58, 66–67, 463 F.2d 894, 902–903 (1972).

41. See Baker v. Carr, supra note 40, 369 U.S. at 198, 217, 82 S.Ct. at 691, 710, 7 L.Ed.2d at 674, 686.

42. See also note 21 supra.

43. Baker v. Carr, supra note 40, 369 U.S. at 210, 82 S.Ct. at 706, 7 L.Ed.2d at, 682, quoting Coleman v. Miller, 307 U.S. 433, 454–455, 59 S.Ct. 972, 982, 83 L.Ed. 1385, 1396–1397 (1939).

44. Baker v. Carr, supra note 40, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686. Accord, Powell v. McCormack, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491, 515 (1969).

45. See United States ex rel. Hollander v. Clay, supra note 21, 420 F.Supp. at 857. Compare Davis v. Passman, supra note 21, 442 U.S. at 235 n.11, 246–247, 99 S.Ct. at 2271 n.11, 2275, 60 L.Ed.2d at 856 n.11, 863–864.

46. See Davis v. Passman, supra note 21, 442 U.S. at 235 n.11, 99 S.Ct. at 2271 n.11, 60 L.Ed.2d at 856 n.11.

47. We discern nothing in the False Claims Act itself to aid a confident answer to the inquiry whether the conduct alleged in count one of appellant's complaint established a claim within its purview.

no others." [48] But we are unable to agree with the American Law Division of the Library of Congress [49] in its conclusion that this statutory directive perforce bars public compensation of congressional staff members for the performance of campaign activities.[50] The unambiguous meaning of this relatively straightforward provision is simply that appropriated funds are to be applied solely to statutorily-enumerated purposes,[51] and the appropriations bills covering the era of Senator Cannon's reelection campaign tells us no more than that their purpose was "compensation of officers, employees, clerks to Senators." [52] Even assuming, as fairly we may, that the funds appropriated were intended solely to compensate staffers for performance of their "official" duties, we are left with the perplexing question whether campaign work is official activity.[53] Not even the Senate itself has been able to reach a consensus on the propriety of using staff members in reelection campaigns; [54] rather, the history of its attempts to develop a suitable rule reveals the lack of a firm standard during the period relevant to this case, and vividly portrays the keen difficulties with which courts would be faced were they to attempt to design guidelines on their own.

**b. Senatorial Treatment**

When, in 1976, Senator Cannon launched his reelection drive, the Senate restricted campaign activity by staff members only in the area of fund-handling. Senate Resolution 266, adopted in 1966, had established standards of conduct for Members, officers and employees,[55] and the sole provision dealing with staffers' participation in campaigns was Rule 43,[56] which allowed only designated employees to receive, solicit, hold, or distribute campaign funds.[57]

Quite significantly the Senate Select Committee on Standards, in recommending Rule 43, noted the high degree of personal allegiance owed a Member of Congress by his immediate staff, and the undesirability of interference with a Member's discretion in assigning duties to staff personnel.[58] Resultantly, the Committee disavowed any intention to deter campaign activity by Senate employees beyond involvement with campaign monies.[59] The floor debate on Resolution 266 similarly was a reaffirmation that a Senator's staff was generally free to assist in his reelection efforts. Both Senator Stennis, the chairman of the Select Committee, and Senator Cooper, a member of the Committee, emphasized that, except for fundraising, the Committee had imposed no limits on staffers' campaign activities.[60]

---

48. 31 U.S.C. § 628 (1976).

49. See note 80 *infra* and accompanying text.

50. See S.Rep.No.95–500, 95th Cong., 1st Sess., 24 (1977).

51. We have not been able to find any judicial or executive interpretation helpful in this connection. The reason may well be that the plain language leaves no room for doubt.

52. Legislative Branch Appropriations Act, 1976, Pub.L.No.94–59, 89 Stat. 269 (1975); Legislative Branch Appropriations Act, 1975, Pub. L.No.93–371, 88 Stat. 424 (1974).

53. We note that the Federal Elections Commission has also not addressed this problem directly.

54. Even had the Senate done so, it is unclear whether a *federal court* would be the appropriate forum for seeking enforcement of its rule on that subject. See *Ray v. Proxmire*, 189 U.S.App.D.C. 220, 223, 581 F.2d 998, 1001, *cert. denied*, 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d

329 (1978) (interpretation and application of Senate rules is usually a matter not for the courts but for the Senate).

55. See 114 Cong.Rec. 7388–7408 (1968).

56. Quoted in note 32 *supra*.

57. See 114 Cong.Rec. 7407 (1968).

58. The Committee explained:

The committee is very reluctant to recommend the curtailment of the discretion of a Senator to assign duties to his assistants, but the relationship of a Senator and his staff requires some regulation to prevent abuse. Recent experience has shown that the handling of political campaign funds by an officer or employee of the Senate is just such a case of abuse.
S.Rep.No.1015, 90th Cong., 2d Sess. 17 (1968).

59. *Id.* at 19.

60. Senator Stennis explained:

It was not until after Senator Cannon's 1976 reelection that the Senate began to reconsider the role of staff in senatorial campaigns. In early 1977, a Special Committee on Official Conduct was instructed to formulate standards of behavior for Members, officers and employees.[61] On March 10 of that year, the Committee reported favorably on Senate Resolution 110, which recommended major changes in the standing rules of the Senate.[62] One suggested revision was a new Rule 49, designed to refine the provisions of the older Rule 43 respecting the handling of campaign funds by forbidding staff members from soliciting such funds.[63] Paragraph 3 of Rule 49 also "attempted ... to deal with some of the complicated and delicate issues relating to the political activity of officers and employees whose salaries are paid by the Senate." [64] The Committee readily acknowledged difficulties in distinguishing between a staffer's official duties and his campaign assistance,[65] but nevertheless proposed removal from the Senate payroll of officers and employees "engag[ing] substantially in campaign activities." [66] The Committee said:

> A proposal was made not to let the staff members have anything to do with a Senator's reelection. However, we unanimously opposed that on the simple ground that the staff is a necessary part of the operation and must work up the facts on which the Senator acts .... So we totally ruled out the idea of prohibiting staff members from taking part in the campaigns for the nomination or renomination of Senators.

114 Cong.Rec. 6836 (1968) (remarks of Senator Stennis). Later, in response to questions from his colleagues, Senator Stennis reaffirmed the narrow scope of Rule 43:

> There is no prohibition on any staff member any time during a campaign. Their pay is not to be stopped or any benefits denied in any way unless they go out and violate the rule about money, receiving or soliciting funds for an election; otherwise, they are free to help out with the record, and the campaign, and to help get up speeches, and so forth.

114 Cong.Rec. 6838–6839 (1968). And Senator Cooper stated:

> I would say that this question on how many employees are used in a campaign is one we cannot deal with now. It seems to address itself to the judgment and the sense of propriety of each Senate [sic].

While the prohibition applies equally to activities on behalf of any candidate for Federal office, the particular concern of the Committee was that Senate staff not stay on the payroll if they are engaging in substantial campaign activities on behalf of the reelection effort of the Senator for whom they work.

The Committee considered writing this rule in terms of the number of hours spent on campaigning for the percentage of time spent on campaign activities, but concluded that this approach would be futile. However, the Committee believes that the intention of the rule is clear enough: If a Senate employee is substantially engaged in campaign activities on behalf of a candidate, that the employee should not be receiving his salary from the Government. The Committee understands that this is the approach currently taken by most Members of the Senate.[67]

Because of the complexity of the issue, however, the rule's injunction was to be qualified by exceptions for an individual's "political activity directly related to his of-

114 Cong.Rec. 6839 (1968) (remarks of Senator Cooper).

**61.** 123 Cong.Rec. 1361–1363 (1977).

**62.** S.Rep.No.49, 95th Cong., 1st Sess. (1977).

**63.** *Id.* at 85.

**64.** *Id.* at 14.

**65.** *Id.* The Supreme Court also has noted the acute problems in differentiating between official and campaign activities. See *United States v. Brewster*, 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507, 518 (1972).

**66.** Paragraph 3 of proposed new Rule 49 read:
> No officer or employer of the Senate who is engaged substantially in campaign activities shall remain on the payroll of the Senate. Nothing in this paragraph shall be construed as prohibiting an officer or employee from engaging in (1) political activity directly related to his official duties; (2) campaign activity of a de minimus nature during office hours; and (3) voluntary campaign activity on the officer's or employee's own time.

S.Rep.No.49, *supra* note 62, at 85–86.

**67.** *Id.* at 52.

ficial duties," [68] for "campaign activity of a de minimus nature," [69] and for "voluntary campaign activity on the officer's or employee's own time." [70]

Paragraph 3 of Rule 49 represents the most serious effort a Senate unit has yet made to regulate the use of Members' personal staffs in reelection campaigns. It met a very early demise, however—a fate reflective of the still-continuing inability of the Senate to prescribe binding standards of behavior in that regard, as well as of the perceived need for further study of the problem. Before Resolution 110 was introduced on the floor of the Senate, Paragraph 3 was withdrawn for reasons stated by Senator Nelson, the floor manager of the resolution:

> The committee found it extremely difficult to write such a rule without making all political activity related to official duties look suspect. The committee concluded that to the extent a problem exists in this area, it could apply equally to the employees of a House Member or a Governor seeking Federal office, and that it was most appropriately a matter within the jurisdiction of the Federal Election Commission. For all these reasons, the committee has recommended that the Rules Committee, which has jurisdiction over the FECA, to [sic] study the problem in the context of its review of the FECA later this year and report proposals dealing with this subject. [71]

Accordingly, Paragraph 3 was replaced with a provision requiring the Committee

on Rules and Administration to report, within 180 days, "proposals to prohibit the misuse of official staff by holders of public office in campaigns for ... election, to Federal office." [72] Resolution 110, as thus altered, was adopted by the Senate. [73]

The report summoned by Resolution 110 did not issue early. While it was awaited, there were developments in the Senate, but these too mirrored the body's usual ambivalence on the problem. On May 11, 1977, the Senate Select Committee on Ethics rendered an interpretive ruling on the use of staff in campaigns pending availability of the report of the Committee on Rules and Administration. [74] The Committee advised:

> In the iterim [sic], Members must use their best judgment in taking staff off the Senate payroll to devote substantial portions of their time or to participate for any extended period in such activities. The Committeee [sic] on Ethics recognizes staff frequently will be reinstated after campaign activities. [75]

Additionally, on June 13, 1977, the Senate agreed to Resolution 188, which effectuated a recommendation by the Committee on Rules and Administration that Rule 49 be amended to allow designated employees to solicit as well as handle campaign funds. [76] It is of no little moment for this case that the Committee's report called attention to Rule 49's proposed ban on fund-solicitation by staffers, [77] and declared that aside from fund-raising rules

---

**68.** See note 66 *supra.* See also S.Rep.No.49, *supra* note 62, at 52.

**69.** See note 66 *supra.* See also S.Rep.No.49, *supra* note 62, at 52.

**70.** See note 66 *supra.* See also S.Rep.No.49, *supra* note 62, at 52–53.

**71.** 123 Cong.Rec. 8041 (1977) (statement of Senator Nelson).

**72.** *Id.* at 8045.

**73.** *Id.* at 10060.

**74.** 124 Cong.Rec. S17599–17600 (daily ed. Oct. 7, 1978).

**75.** *Id.* at S17599–17600. The Committee also addressed the question "[t]o what extent may Senate employees volunteer time after office hours or while on annual leave to assist in political fund raising events for Members and candidates for election to the Senate?" *Id.* at S17599. The Committee responded:

> In the interim Members should remove staff from the Senate payroll to participate for any extended period in such activities.
> *Id.*

**76.** 123 Cong.Rec. 18626 (1977).

**77.** S.Rep.No.241, 95th Cong., 1st Sess. 1, 2 (1977). See also note 63 *supra* and accompanying text.

[t]he committee is not aware of any laws which prohibit individuals who are part of a Senator's staff from participating in a Senator's reelection campaign as long as they do not neglect their Senate duties, and the committee does not feel there should be such proscriptions.[78]

Meanwhile, the Committee on Rules and Administration pressed forward in the mission directed by Senate Resolution 110.[79] Early on, the Committee requested the American Law Division of the Library of Congress to examine and report on existing law relating to utilization of federal employees in election campaigns.[80] As the deadline for the Committee's report drew near, however, its task remained incomplete.[81] The Senate therefore authorized the Committee to consider the referred issues in two stages—the first a report on current law, and the second a study of the problem based upon conclusions reached at the end of the fist stage.[82]

The Committee issued its first report on October 17, 1977.[83] With respect to staff use in election campaigns, the report recounted the salient events discussed earlier in this opinion.[84] On the basis of this review, the Committee concluded that "[o]ther than the actual handling of campaign funds, the Senate has not imposed any restrictions on the participation of a member of a Senator's staff in that Senator's reelection campaign."[85] The Committee therefore supported the

> general rule . . . that members of a Senator's staff are permitted to engage in the reelection campaign of a Senator, as long as that staff member does not neglect his or her Senate duties. The nature and scope of a staff member's Senate duties are determined by each Member of the Senate. Such duties necessarily encompass political and representational responsibilities, as well as legislative, administrative, or clerical ones, and are often performed during irregular and unconventional work hours. A similar rule of practice has been followed in the House of Representatives, and would be generally applicable to other Federal employees not covered by the Hatch Act.[86]

The Committee announced its intention to study, as the second stage of its work, the role of staff members in political campaigns[87]—a project in which the Committee presumably is still engaged.[88]

### 3. Manageability and Need for Initial Policy Determinations

As this historical resume makes abundantly clear, there were in 1976—and there are now—no "manageable standards" for a court to apply when viewing staff participation in a Senate reelection campaign.[89]

---

**78.** *Id.* at 1–2.

**79.** See text *supra* at note 72.

**80.** S.Rep.No.95–500, 95th Cong., 1st Sess. 1, 4 (1977).

**81.** See *id.* at 2.

**82.** *Id.*

**83.** See *id.*

**84.** *Id.* at 2–5. The report of the American Law Division of the Library of Congress was appended as Exhibit 1 to the Committee's report. *Id.* at 15–34. The Library of Congress study reached these overall conclusions:

> There appear to be no Federal statutes which specifically prohibit Federal officeholders from using their official staff for campaign purposes. There exist, however, various broad general guidelines which direct that official staff fulfill their official duties; and, in addition, certain executive branch employees are prohibited from engaging in any partisan political activity.
>
> In the case of official staff working for Members of Congress, the Member delineates the staffers' official duties. Once the staffer has fulfilled these official duties, he may then volunteer his free time to work on campaign matters for the Member.
>
> *Id.* at 15 (footnote omitted).

**85.** *Id.* at 2.

**86.** *Id.* at 4.

**87.** *Id.* at 2, 5.

**88.** Our research has not disclosed anything further from the Committee.

**89.** See text *supra* at notes 43–46.

Moreover, the inability of the Senate—a body constitutionally authorized and institutionally equipped to formulate national policies and internal rules of conduct—to solve the problem demonstrates "the impossibility of deciding" the issue appellant poses "without an initial policy determination of a kind clearly for nonjudicial discretion."[90] Indeed, the interpretation of the False Claims Act suggested by appellant would license the courts to monitor every action taken by a Senator and his aide in an effort to determine whether it is sufficiently "official" or too "political."

The dilemma thus posed is just as unsurmountable here as we found it to be in another recent case—one involving a presidential reelection campaign.[91] There we cited both lack of standing and general prudential considerations in declining to exercise jurisdiction to deal with claims of misuse of federal power and funds by a candidate who allegedly had followed

> a concerted course of conduct designed to use the public treasury for salaries, travel expenses, costs of meetings and other political outlays; to grant and withhold public employment based upon political support by the employee; and to promise and award federal programs and funds to communities as political inducements and rewards, all in order to obtain support for President Carter's renomination.[92]

These accusations, we noted, "relate[d], quite literally, to virtually every discretion-ary decision made by the Administration acting through . . . high government officials;" "[c]onsequently," we said, "any relief, to be effective, would have to be as broad as the authority of the high offices held by the federal defendants."[93] So,

> [w]hether shaped as declaratory relief, or injunctive relief, or both, the court's judgment would have to interject itself into practically every facet of the Executive Branch of the federal government, on a continuing basis, for the purpose of appraising whether considerations other than pure public service motivated a particular defendant in the performance of his or her official duties.[94]

But this, we concluded, was beyond the ability of the judiciary, for the courts simply are "not suited to undertake neutral consideration of every Executive action."[95] And we pointed out that resolving the issue drawn would compel us to make fundamental policy decisions:

> For this court to undertake the inquiry which would be required in this case would be to invade the far corners of the Executive Branch by subjecting countless Administration decisions to judicial scrutiny for any vestige of political motivation. . . . [I]n addition to being unmanageable[,] [n]either would that inquiry proceed on the basis of a discrete judicial standard . . . . Rather the court would be assessing the correctness of an action assigned to the Executive Branch and

90. *Baker v. Carr, supra* note 40, 369 U.S. at 217, 59 S.Ct. at 710, 83 L.Ed. at 686.

91. *Winpisinger v. Watson,* 202 U.S.App.D.C. 133, 628 F.2d 133 (1980).

92. *Id.* at 135, 628 F.2d at 135.

93. *Id.* at 139, 628 F.2d at 139.

94. *Id.*

95. We were also concerned that close supervision of the Executive Branch might violate separation-of-powers principles, for such "action would necessarily carry with it an implied lack of respect for a coordinate branch of government." *Id.* at 140 n.30, 628 F.2d at 140 n.30. While we do not believe that judicial examina-tion of congressional employment decisions would necessarily connote disrespect, see text *supra* at note 45, close oversight of daily legislative activities—coupled with a lack of congressionally-endorsed standards—might well be seen as invading the legislative prerogative. Thus, in *Public Citizen, Inc. v. Simon,* 176 U.S. App.D.C. 209, 539 F.2d 211 (1976), we observed in a related vein that granting taxpayers standing "to attack any executive action that draws on an outstanding appropriation on the ground that the purchases or services are not in accord with the congressional intent in passing the appropriation . . . would place the judiciary in the role of management overseer of the Executive Branch. Such oversight is a function of Congress." *Id.* at 215, 539 F.2d at 217.

often requiring substantial supporting personnel and expertise, as well as a significant time investment.[96]

In the absence of any discernible legal standard—or even of a congressional policy determination—that would aid consideration and decision of the question raised by appellant's first count, we are loathe to give the False Claims Act an interpretation that would require the judiciary to develop rules of behavior for the Legislative Branch. We are unwilling to conclude that Congress gave the courts a free hand to deal with so sensitive and controversial a problem, or invited them to assume the role of political overseer of the other branches of Government. Accordingly, we affirm the District Court's dismissal of appellant's first claim. In doing so, we do not, of course, say that Members of Congress or their aides may defraud the Government without subjecting themselves to statutory liabilities. We simply hold that under the facts alleged in count one of appellant's complaint, no cause of action has been made out under the Act.

## III. THE COUNT TWO CLAIM

■ Appellant's remaining contention, advanced in the second count of his complaint, is that at unspecified times unnamed members of Senator Cannon's staff rendered personal services for the Senator and his family while collecting their governmental salaries.[97] The District Court held that this allegation did not state a claim upon

which relief could be granted because appellant had not "point[ed] to one specific instance in which a member of Cannon's personal staff was paid out of public income for personal tasks he or she performed." [98] We agree though we do not consider the issue to be as straightforward as the District Court suggests.

Rule 9(b) of the Federal Rules of Civil Procedure mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." [99] It cannot be doubted that "[n]ormally this means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." [100] The rule serves to discourage the initiation of suits brought solely for their nuisance value,[101] and safeguards potential defendants from frivolous accusations of moral turpitude.[102] The need for this protection is especially acute where, as here, the principal defendant is an elected official whose reputation and position are particularly vulnerable to accusations of wrongdoing.[103] And because "fraud" encompasses a wide variety of activities, the requirements of Rule 9(b) guarantee all defendants sufficient information to allow for preparation of a response.[104]

In the present case, plaintiff's allegations could hardly have been more generalized and vague. He did not specify which members of the Senator's staff were involved,

**96.** *Winpisinger v. Watson, supra* note 91, 202 U.S.App.D.C. at 140 n.30, 628 F.2d at 140 n.30.

**97.** See text *supra* at note 12.

**98.** *United States ex rel. Joseph v. Cannon, supra* note 4, at 2, App. 5.

**99.** Fed.R.Civ.P. 9(b).

**100.** 2A J. Moore, Federal Practice �System 9.03, at 9–20 to 9–24 (2d ed. 1980). See 5 C. Wright & A. Miller, *supra* note 10, at § 1297.

**101.** 5 C. Wright & A. Miller, *supra* note 10, at 1296.

**102.** *Id.*

**103.** *Felton v. Walston & Co.*, 508 F.2d 577, 581 (2d Cir. 1974) ("one purpose of rule 9(b) is to protect reputations of . . . professionals from scurrilous and baseless allegations of fraud"); *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 245 (S.D.N.Y.1975) ("[t]he need for this protection [against vague allegations of fraud] is most acute where the potential defendants are professionals whose reputations in their field of expertise are most sensitive to slander").

**104.** *Felton v. Walston & Co., supra* note 103, 508 F.2d at 581; *Rich v. Touche Ross & Co., supra* note 103, 68 F.R.D. at 245; 5 C. Wright & A. Miller, *supra* note 10, at § 1296.

and he left unstated just what personal services they performed and precisely when those activities occurred. He even failed to allege any neglect of official duties.

Rule 9(b) is not, however, to be read in isolation from other procedural canons. As Professor Moore notes, "[t]he requirement of particularity does not abrogate Rule 8,[105] and it should be harmonized with the general directives in subdivisions (a) and (e) of Rule 8 that the pleadings should contain a 'short and plain statement of the claim or defense' and that each averment should be 'simple concise and direct.' "[106] Viewed in this light, Rule 9(b)'s requirement of particularity is less certain a standard for measuring the sufficiency of a complaint, and we are constrained to probe deeper than the District Court did.

The rules of civil procedure are not to be strictly construed,[107] and a "a litigant ought not be denied his day in court merely on the ground that his complaint is inartfully drawn."[108] The usual method for dealing with a nebulous complaint, then, is either to grant leave to amend[109] or to dismiss the complaint without prejudice.[110] Appellant now asks permission to file "a more definite statement of the claim, a bill of particulars or ... to obtain the facts by discovery."[111] We think, however, that in the circumstances here the District Court's dismissal should be sustained. Appellant had more than eleven months—from June 7, 1977, when appellees filed their motion to dismiss, until May 25, 1978, when the District Court issued its dismissal order—to remedy the deficiencies of the original pleading. He made no effort to do so, and "[a]bsent some indication as to what appellant[ ] might add to [his] complaint in order to make it viable, we see no reason to grant appellant[ ] relief in this court which was not requested below."[112]

The judgment appealed from is affirmed.

So ordered.

**105.** Fed.R.Civ.P. 8.

**106.** 2A J. Moore, *supra* note 100, at ⸗ 9.03, at 9-28. See *Felton v. Walston & Co., supra* note 103, 508 F.2d at 581; *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

**107.** *Conley v. Gibson, supra* note 34, 355 U.S. at 48, 78 S.Ct. at 103, 2 L.Ed.2d at 86. See also *Foman v. Davis,* 371 U.S. 178, 181–182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225–226 (1962); 2 J. Moore, *supra* note 100, at ⸗ 1.13[1]; 4 C. Wright & A. Miller, *supra* 10, at § 1029.

**108.** *Mooney v. Vitolo,* 435 F.2d 838, 839 (2d Cir. 1970).

**109.** See Fed.R.Civ.P. 15(a); *Foman v. Davis, supra* note 107, 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d at 226.

**110.** See *Barry v. St. Paul Fire & Marine Ins. Co.,* 555 F.2d 3, 13 (1st Cir. 1977), *aff'd,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).

**111.** Brief for appellants at 11.

**112.** *National Union of Hospital and Health Care Employees v. Carey,* 557 F.2d 278, 282 (2d Cir. 1977) (citation omitted). See *Phillips v. Bureau of Prisons, supra* note 34, 192 U.S.App. D.C. at 368, 591 F.2d at 977 ("[b]ecause appellants have not sought to amend their complaint in either this court or the court below, this litigation draws to an end"); *Coates v. Board of Educ.,* 559 F.2d 445, 451 (7th Cir. 1977) (not error to dismiss complaint for insufficiency where leave to amend was never sought); cf. *Foman v. Davis, supra* note 107, 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d at 226 ("futility of amendment" is valid reason for not conferring right to amend following dismissal for failure to state a claim upon which relief can be granted); *Clark v. National Travelers Life Ins. Co.,* 518 F.2d 1167, 1169 (6th Cir. 1975) ("there is no 'duty [on the part] of the trial court or the appellate court to create a claim which appellant has not spelled out in his pleading' "), quoting *Case v. State Farm Mut. Auto Ins. Co.,* 294 F.2d 676, 678 (5th Cir. 1961).